BRIDGET TECKENBROCK v. ANNA McLAUGH-
LIN et al., Appellants.

Division One, February 26, 1908.

1. **WILL CONTESTS: Question for Jury.** Not every will contest is to be submitted to the jury. The court may give a peremptory instruction for proponents, or sustain a demurrer to contestants' evidence, as in other cases. Statutory will contests are on the same footing as ordinary law suits, as regards the province of the court or jury.

2. ————: **Undue Influence: Statement By Son-in-law.** A statement made by the husband of one of the devisees, to a witness, in the absence of testatrix, that testatrix "is no lady, because she did not do what I wanted her to do," meaning the making of a will in accordance with his wishes, is not competent evidence of undue influence.

3. ————: ————: **Statement Made By Devisee: As Affecting Other Devisees.** Where the petition charges no conspiracy between the devisees to influence their mother to make a will, it is not error to exclude a statement made by a daughter to a third party, in the absence of the mother and her other three children, that "while I live" her disinherited sister "shall not receive one cent of my mother's property if I can help it." The issue is will or no will, and a will that is shown by competent proof to be in fact the product of the undue influence of one devisee, out of several, is as much void as if it was the product of the undue influence of all of them; but where it is not shown that this daughter exercised any influence over her mother or had anything to do with the execution of the will, her unsisterly statement or admission was not competent against the others, to prove that undue influence was exercised by her.

[Following Schierbaum v. Schemme, 157 Mo. 1, and overruling Gordon v. Burris, 141 Mo. 602, and Jackson v. Hardin, 83 Mo. 175.]

4. ————: ————: **Daughter: Decrease of her Share.** A daughter's influence in having her mother in her last will omit a special annuity and bequest made to her by a former will, and to increase to that extent the share of the other devisees, cannot be said to be undue.

5. ————: ————: ————: **Explanation.** An unmarried daughter, who resided with her mother, lovingly cared for her, and turned into the family chest the surplus of her wages earned as a stenographer over and above what was necessary to clothe herself, and went with her to the lawyer's office when the will was made and at her request made the appointment with him for the occasion, stood in no such fiduciary relation to the mother as threw upon proponents the burden of explaining the provisions of the will or as would raise a presumption that it was produced by her or their undue influence.

6. ————: ————: **How Shown and Effect.** Undue influence need not be shown by direct evidence. It may be shown indirectly and arise as a natural inference from other facts in the case. But it cannot rest on mere opportunity to influence or on suspicion; there must be proof of undue influence itself, either in fact or presumptively, and to be effective it ought to be sufficient to destroy the free agency of the testator at the time of making the will.

7. ————: ————: **Statements Made by Testate.** Where there is an issue upon the state of affections of the testatrix, statements and admissions made by her may be admitted upon that point, but they are not to be received or taken as proof of the truth of facts narrated. They are not to be taken as true for the purpose of establishing undue influence and defeating the will.

8. ————: ————: **Prior Wills.** About 1882 plaintiff married against the wishes of her father and mother, and thereafter a business quarrel arose between her father and husband, which developed into a lawsuit in which the husband obtained judgment, which the father paid. Thereafter both the father and mother made wills, by which they disinherited plaintiff, and he gave all his property to his wife, suggesting therein that, should she survive him, she give it to his other four children. After his death and the death of one of the four children, plaintiff's mother in 1892 made a new will, by which she disinherited plaintiff, gave an annuity to her two unmarried daughters and the balance to the three of them in equal por-

tions. Subsequently one of the annuitants married, and the other became self-supporting, and then, in 1903, she made a third will, by which, at the request of the unmarried annuitant, she cut out the annuities, gave to her her household effects, and divided the balance equally between the same three children, again disinheriting plaintiff. This unmarried daughter, at her request, made the appoinment with the lawyer to draw up the will and went with her when it was drawn up and executed. There was testimony that, while the first and second wills were operative, and even after the one of 1903 was executed, when none of the principal beneficiaries was present, the mother said to plaintiff and others that she had a kindly testamentary disposition towards plaintiff, that she recognized her faithful services in the days before the breach of the family peace, that she had become reconciled towards her, that it was her heart's desire to treat her in her will as she did her other daughters, but that she was in bonds on account of their opposition and could not do as she wanted to do without exposing herself to bother, trouble and unhappiness. *Held*, that there was no evidence of undue influence, that her statements and admissions were not evidence to establish undue influence, and the court properly gave a peremptory instruction for proponents.

Appeal from St. Louis City Circuit Court.—*Hon. O'Neil Ryan*, Judge.

Reversed and remanded (*with directions*).

*Rassieur, Schnurmacher & Rassieur* for appellants.

*John S. Leahy* and *Taylor R. Young* for respondent.

LAMM, J.—Bridget, a married daughter of Mary McLaughlin, as contestant, brought her statutory action against contestees, her sisters and the husbands of those married, to contest her mother's will—her said sisters being the beneficiaries. At the trial a peremptory instruction was given for contestees, requiring the jury to find the paper writing in question was the last will and testament of Mary McLaughlin. From an order setting aside the verdict, defendants appeal.

The issue on the pleadings is outlined by plaintiff's counsel as follows: ''The pleadings in the case are brief and concise and raise but one issue. That is, whether or not the will offered for probate was executed by deceased at a time when she was so under the influence of certain defendants and was so intimidated by them that the will was not in fact the will of deceased.''

In view of the small compass so fetched on the issues in the pleadings, it will be useful to keep in mind from end to end of the case that certain issues quite common to will contests are absent here, and, therefore, those principles of law applicable to such absent issues are not to be indiscriminately applied in the determination of the case at bar. For instance: (1) There was no issue on testatrix's testamentary capacity. The case proceeded below on the theory she had a sound mind and disposing memory at the date of the will. (2) Neither was there any issue tendered of conspiracy between contestees to concoct the will or that it was a product of such privity of design or conspiracy. (3) Neither was there any issue tendered to the effect that the beneficiaries under the will, or any of them, held such fiduciary relation to testatrix as would presum-

ably give their minds mastery over hers and thus raise a presumption of undue influence and cast upon them the burden of rebutting it.

At the trial contestees introduced the attesting witnesses, made due proof of formal execution, introduced evidence tending to show testatrix was of sound and disposing mind and memory and, having thus made a *prima-facie* case, rested. Thereupon plaintiff offered her evidence, and at the close of her case the peremptory instruction was given.

The new trial was put below upon the grounds, first, that there was substantial evidence put in tending to show undue influence; and, second, that there was error in excluding certain testimony offered by plaintiff.

The will in question bears date of February 23, 1903, and testatrix died the following November. In the summer or early fall of 1902, a witness for plaintiff, one Reuter, had a conversation with testatrix and was allowed to detail it to the jury. On the morning following the evening of that conversation, Reuter held another with Mrs. Bentzen, one of the contestees, and in that connection a certain offer was made, not only of what Mrs. Bentzen said to Reuter, but of what her husband, Otto, said to him. That offer was as follows:

"We offer to show by the witness George Reuter that on the morning following the evening on which he had the conversation with Mary McLaughlin, deceased, on the bench in the yard of the Kossuth avenue residence of Otto Bentzen, Mamie Bentzen, one of the defendants in this cause, asked the witness what he was talking to her mother about, and when he replied that she was talking to him about her will she replied in substance, 'I know that she was talking to you about her intention to leave Beazie (meaning the plaintiff, Mrs. Teckenbrock) an equal share, but while I live that

—— — shall not receive one cent of my mother's property if I can help it.'

"Also, further, that Otto Bentzen, upon the same occasion, stated to witness that deceased was no lady, because she would not do what he wanted her to do, meaning to make a will in accordance with his wishes."

On objection of defendant's counsel, the court refused the offer, and in granting a new trial laid stress on its excluding so much of the offer as related to the statements of Mrs. Bentzen.

Appellants' counsel contend the court did not err in excluding that evidence, and contend that the court did right in taking the case from the jury; because, they say, there was no substantial evidence tending to show undue influence. *Contra*, respondent's counsel outlines his contentions as follows: "We are here contending, first, that the trial court committed reversible error in excluding certain evidence when offered by the contestant, and hence the learned trial judge was right in reversing himself and granting a new trial, and, second, that even on the evidence as it was allowed to go in, the question of undue influence should have been submitted to the jury."

Attending to questions made on appeal, other material facts will appear in the opinion.

I. The first point of respondent's counsel is that: "Any contest of a will raises an issue of fact and should be submitted to a jury."

Counsel does not say in so many words that a will contest differs from other law cases, in that a court has no prerogative to direct a verdict; but if by use of the broad language of his proposition he suggests such idea, he is in error. That will contests are peculiar in certain features, is true. They are held to be a solemn form of probating wills under our statute. It has been said, speaking by analogy, that such contests are in the nature of appeals from the interlocutory

action of probate courts in the mere *ex parte* probating
of wills in common form. [Dickey v. Malechi, 6 Mo.
177; Benoist v. Murrin, 48 Mo. 48; Harris v. Hays, 53
Mo. 90; Cash v. Lust, 142 Mo. l. c. 637.] The burden of
proof is on contestees, in the first instance. [Campbell
v. Carlisle, 162 Mo. l. c. 644; Maddox v. Maddox, 114
Mo. l. c. 46; Mowry v. Norman, 204 Mo. 173.] They
must make a *prima-facie* case as proponents of the will,
hence they have the opening and closing to the jury.
[Benoist v. Murrin, 58 Mo. l. c. 321.] Having made
that *prima-facie* case, contestants introduce their proof.
Thereupon the proponents of the will offer their evi-
dence in rebuttal and to fortify their *prima-facie* case.
[Harris v. Hays, *supra*; Carl v. Gabel, 120 Mo. 283;
Jackson v. Hardin, 83 Mo. l. c. 187.] It has been held
that contestants should not be required to give security
for costs and that the case should not go out of court
without a judgment in solemn form probating the will,
or refusing to probate it. [Cash v. Lust, 142 Mo. l. c.
637.] The foregoing singularities make a will contest
one *sui generis* in a sense. But, when so much has been
said, it may also be said it is not the rule in Missouri
that the courts in a will contest may not say there is no
substantial evidence to sustain a certain issue and may
not direct a verdict one way or the other based on the
existence of uncontradicted testimony on an issue, or on
the absence of proof on such issue. Statutory will con-
tests in that regard are on the same footing as ordinary
law suits. [McFadin v. Catron, 138 Mo. l. c. 213-27;
Story v. Story, 188 Mo. l. c. 129; Bradford v. Blossom,
207 Mo. l. c. 228.] In the latter case, a judgment was
directed rejecting the will. In the two former, judg-
ments were directed solemnly probating wills.

The rule in this jurisdiction being as indicated, the
court on the one hand or the jury on the other has no
less and no greater prerogative in a will contest than
in any other suit at law; and, therefore, the rule is that

contestants are entitled, on demurrer to the evidence, not only to the full force of all their uncontradicted testimony, but to have their evidence taken as true where contradicted, and every reasonable inference to be deducted from the testimony is to be allowed in their favor in determining the law question made on demurrer. But if proof is lacking, or if it runs so strongly one way that there can be no two ways about it, the court may direct a finding.

II. Did the court err in refusing the offer made of evidence from Reuter? We think not, because:

(a) Mary McLaughlin had five children — the plaintiff, Bridget Teckenbrock; a son, Michael, who died before his mother, intestate and without leaving any descendants; the defendant, Anna, an unmarried daughter; a married daughter, Catherine Schroeter, intermarried with Bruno Schroeter; and Mary Bentzen, intermarried with Otto Bentzen — all of them codefendants with Anna. Mrs. McLaughlin died seized and possessed of property of a value not definitely fixed but amounting to several thousand dollars. To Bridget she left one dollar. To the single daughter, Anna, she bequeathed all her household effects including "goods and chattels, wearing apparel, bric-a-brac and jewelry." The residue of her estate, real and personal, she devised and bequeathed to Catherine, Mary and Anna in equal shares and unto their heirs and assigns forever.

Otto Bentzen did not share as devisee or legatee under the will. Therefore, it is not apparent why, on any view, his statement was admissible in evidence. As pointed out, the court laid no stress on this portion of the offer and we do not understand that plaintiff's learned counsel now insists it was error to exclude what Reuter would say Otto said to the effect, "that deceased was no lady, because she did not do what he

wanted her to do, meaning to make a will in accordance with his wishes.''

(b)   Recurring to the remainder of the offer, it raises this question:   Where there is no charge or proof of a conspiracy between Anna, Mary and Catherine to concoct a will disinheriting Bridget, is it competent to prove the admission of Mary made prior to the execution of the will not in the hearing of the others, or of the testatrix, to the effect that: ''I know that she (deceased) was talking to you (Reuter) about her intention to leave Beazie (meaning Bridget) an equal share, but while I live that — shall not receive one cent of my mother's property if I can help it?''  And in answering that question it is important to keep in mind that the issue is: *Will or no Will.*  If the issue was whether Mary's devise alone should lapse then another and an essentially different thing would be here for determination.

A similar proposition was before this court in Schierbaum v. Schemme, 157 Mo. 1, in June, 1900. There Mrs. Schierbaum was allowed to testify to a damaging admission by George Schemme, one of the legatees, and it was held error.   The question was elaborately discussed on principle and authority.   It was pointed out that the general rule permitting the admission of a party to a suit to be put in evidence has a main qualification in a will contest where there are other legatees and devisees vitally interested in upholding the will.   It was pointed out that in will contests in Massachusetts and Pennsylvania, the exception to the general rule relating to admissions was maintained by reasoning satisfactory to this court and that such exception was sustained by the weight of decided cases.

Certainty in a rule of law is of prime importance in administering justice, and it is not apparent to us why we should unsettle the doctrine of the Schierbaum

case. That doctrine, discriminatingly applied, does not cover a case charging in the petition and showing in the proofs that there was a privity of design among the contestees. In such case or in a case where there is only one devisee or legatee to be affected by avoiding the will, the general rule relating to admissions of parties to the suit may be allowed to obtain in its vigor. [Clark v. Morrison, 25 Pa. St. l. c. 456; Wood v. Carpenter, 166 Mo. l. c. 485; Meier v. Buchter, 197 Mo. l. c. 92.] The Schierbaum case was followed in King v. Gilson, 191 Mo. l. c. 333, and in Seibert v. Hatcher, 205 Mo. l. c. 101, *et seq.*]

In deciding the Schierbaum case, certain cases announcing a contrary doctrine were overruled by name. It seems, however, the heresy exploded had been imbedded in other cases escaping the eye of this court, for example: Gordon v. Burris, 141 Mo. 602, and Jackson v. Hardin, 83 Mo. 175. So far as the Gordon case and the Jackson case announce a conclusion contrary to the Schierbaum case, they are now overruled; and we leave the subject with these observations: A will that is shown by competent proof to be in fact the product of undue influence of one devisee or legatee, out of several, is as much void as if it was the product of the undue influence of all of them—it is a bad will. The innocent may not take property as the result of a tainted devise or bequest merely because they were free of the vice. A gift fetched by an unchaste hand may well be held to be polluted. Such is not the question here, but a deeper one arises, viz.: Had Mrs. Bentzen undue influence over her mother? —did she actually exercise such undue influence? In this case it is not shown that Mrs. Bentzen had anything to do with the execution of the will in suit. The offer stopped with her bald admission relating to her unsisterly but individual desire and feeling. As stated by appellants' learned counsel, "The question is,

whether the proof (the admission) is competent as against the others, *to prove the fact that undue influence was exercised by one?*" ·

Under the doctrine of the Schierbaum case and cases following that, the admission was not competent for that purpose and, therefore, in so far as the trial court was influenced in setting aside the verdict by the exclusion of that admission, it was error.

III. With the foregoing questions at rest, we reach the main point, viz.: Was there any substantial evidence tending to show the will to be the product of undue influence? This question seeks other facts.

Uncovering them, it appears that in 1881 or 1882 Bridget married against the wishes of her father, Patrick, and her mother. Presently, on top of this forbidden marriage, an unhappy business quarrel sprang up between her and her husband on one side and her father and mother on the other. It found its way into court and was so inflamed that it burned in two all domestic bonds uniting Bridget to her family. Finally, in 1888, the suit culminated in a judgment in favor of Mr. Teckenbrock and against Bridget's father and it seems this judgment was largely based on the testimony of Bridget herself. The judgment was paid and at about that time Patrick and the mother made cross-wills disinheriting her. The merits of that family lawsuit are not before us and may be left to oblivion. The justice or injustice of the wills of 1888, we may not determine. It is sufficient to say that said wills evidenced a then settled policy in her parents, and that Bridget was disinherited by them because they chose to consider the judgment obtained against the father and paid off by him represented Bridget's fair proportion of her father's then estate. These cross wills were drafted by Judge Rassieur, who had been counsel for the father in the litigation and was his trusted legal adviser. By Patrick's will the estate was left to his

wife, if she survived him—four children, Michael, Catherine, Mary and Anna, being commended to her care and protection. In case the wife did not survive, the estate went to said four children, share and share alike. The mother's will of that date was but the echo of the father's in terms. Presently the father died and his widow, acting also as testatrix, took the estate under the will after an administration in the probate court in which Judge Rassieur represented her and the estate. Michael afterward died, and in 1892 the mother made a new will after consultation with Judge Rassieur. Like the former, this one was drawn by him as family counselor. By it Bridget was again disinherited. Certain annuities were provided for the then single daughters, Anna and Catherine, to be paid them for each and every year until they severally ceased to work for testatrix. The residue of the estate was divided between the daughters, Anna, Catherine and Mary. In the will of 1892, Luke McLaughlin, a brother of Patrick, was made executor, and this will and the former ones were left in Judge Rassieur's safe. Afterwards business differences arose between testatrix and Luke. He had borrowed a sum of money from her, secured by a second mortgage. Negotiations having failed to recover this money, the mortgage was foreclosed by sale under the supervision of Judge Rassieur. Desiring to change the executor and to eliminate the annuities provided for the daughters, Anna and Catherine, testatrix in 1903 made the will now under contest. There is proof that the provisions of the wills of 1903, 1892 and 1888, disinheriting Bridget, had their root in the will of Patrick McLaughlin under which testatrix got the estate. She seemed to look on that provision in her husband's will as somewhat binding upon her and as calling on her to carry out a wish of his that may be said (in her mind) to run with the estate. The material terms of the last will have been set forth. In it

Anna was made executrix and in case she died the son-in-law, Bruno Schroeter, was named as executor. Bridget, as said, was again disinherited. The annuities to Anna and Catherine were dropped and to Anna was left the household effects including wearing apparel, bric-a-brac and jewelry of a value not disclosed. The cause of Anna's preference is explained in the will itself to be that: ''She having remained with me longest and rendered so many services without compensation, which makes it proper that I should make this bequest in recognition of her faithful services aforesaid.'' Saving Anna's preference, the estate was divided equally between her and her sisters, Catherine and Mary. This will was also the result of a consultation by testatrix with Judge Rassieur, as her counselor. It revoked all prior wills, as did each of the others in turn, and by direction of the mother was taken by Anna and put in a safety deposit box, under the mother's injunction not to mention the fact of its execution. There was evidence that Anna's annuity was left out of the will at her request on the ground that she felt it was unjust to her two sisters, Mary and Catherine. When the 1903 will was made, Anna went with her mother to Judge Rassieur's office. At the request of her mother she made the appointment with him for that occasion. Aside from that service and barring her request that the testamentary annuity to her, set forth in the will of 1892, be eliminated, she took no part in the consultation between testatrix and her counsel. As to Mary and Catherine, there is not a shred of evidence they or either of them at any time took part in the concoction of any one of the series of wills. The case is barren, as said, of any testimony showing testatrix was not competent to transact her business affairs. So far as shown she did transact them with sense and discretion. She had her property

and the objects of her bounty in mind, collected her rents, made investments of her money, and came down to the grave sane.

There is no proof worthy of the name that the will was the result of undue influence on the part of Anna or any of the other devisees brought to bear upon the mother at other times, *unless the admissions of the mother to be presently considered be taken as such proof.* True, Anna may have had influence in causing the bequest in her favor in the 1892 will to be left out of the last, but it can scarcely be said to have been *undue.* When Mary and Catherine married and left home, Anna continued to reside with her mother. She was a stenographer, held a position as such and her wages, over and above what was necessary to clothe her, it seems went into the family chest. They kept house in a flat to themselves. We see no word of evidence tending to show that the relations between these two made Anna anything but the loving and daughterly handmaiden of the mother. And, as pointed out, there was no charge in the petition or proof offered tending to show that either Anna, or any of testatrix's other daughters, stood in such fiduciary relation to her as would throw upon them, or any of them, the burden of explaining the provisions of the will, or raise a presumption that it was produced by their undue influence.

The rule of law, therefore, announced in Mowry v. Norman, 204 Mo. 173, and cases cited, to the effect that one who is shown to have had the mastery over the mind and business of a testator by standing in the relation of a physician, attorney, guardian, or other like relation of confidence, and who acquires an advantage in a will, labors under the burden of rebutting the presumption that undue influence was exercised in procuring that advantage, cannot be applied to the facts of this case.

Plaintiff took the stand in her own behalf and brought forward a witness, George Reuter. Her own evidence tended to show that at about the time of the death of her father she was sent for and made her peace with him and her mother—whether that peace included her husband is dark. That for some years she was in good circumstances, but had met with misfortune. As tending to show undue influence, she was permitted to give in detail several conversations with testatrix at uncertain times—some of them, we infer, while the will of 1888 was still operative, some of them during the life of the will of 1892 and some of them subsequent to the will of 1903. George Reuter also had conversations with testatrix. It will not be necessary to swell the opinion with the details of them. What was material in them was said at times when no one of the principal beneficiaries was present. As strongly stated as possible, the substance of it all was that the mother had a kindly testamentary disposition towards Bridget. That she recognized her faithful services in the days before the breach of their family relations. That it was her heart's desire to treat her in her will as she did her other daughters, but that she was in bonds on account of their opposition and could not do as she wanted to do without exposing herself to bother and unhappiness.

It may be admitted that if these statements of the testatrix are to be taken as probative proof of the exercise of undue influence—as tending to show the will of 1903 was not the mother's will but the will of the daughters—then there was a case to go to the jury. On the other hand, if under all the facts of this case such statements and admissions by the testatrix, standing alone, do not constitute proof of the existence of the fact of undue influence, then there was no case to go to the jury.

As a preliminary observation, we can not too often

remind ourselves of what was said, as an admonition, in the Schierbaum case by VALLIANT, J. (157 Mo. l. c. 16), speaking of rules relating to the admission of the statements of a testator, viz.: "These rules of evidence are not established by mere arbitrary law, nor are they designed to restrict the legitimate range of inquiry in the trials of disputed facts. But on the contrary they are made in the interest of justice, and experience demonstrates their wisdom. In a heated conflict where enmity often supplements interest the aptitude to misunderstand and even the temptation to misrepresent is not infrequently apparent. Even when a rehearsal of a conversation is admissible in evidence the courts are fond of saying that little weight is given to what dead men are said to have said."

In some cases the question has come up on statements made subsequent to the will, but this is not so in all, and it is difficult to say, on principle, that a rule on the admission of statements of a testator faces one way on subsequent statements and the other way on prior statements. The leading case in this court (Gibson v. Gibson, 24 Mo. 227) was written by Judge LEONARD. In that case he reviewed cases where the statements were made after the execution of the will and made "about the time" of its execution. In the exposition of the matter, he comments, as follows:

"We all know that when men who have made their wills, or are about to make them, are questioned by expectants, or the friends of expectants, or when such men, without being questioned, think proper to talk upon the subject, they do not always hold themselves bound to tell the whole truth. It is said to be something like the privilege of voting by ballot—concealment is here permitted, and deception is sometimes practiced. A testator may have reasons to wish for quiet, and when disappointments are to happen, the law puts it in his power to escape from the effects of

them, and to avoid taking a part in the scuffles that are to ensue about dividing his property. And even men, who do not care about concealment, may often really intend to make a will in a particular way, or to alter one already made, and after declaring such intentions may change their minds. Hence it is that even those judges, who have thought the evidence admissible, have admitted that it is entitled to very little weight."

To sum it up, he held that such statements were admissible, "When the condition of the testator's mind is the point of contention, or it becomes material to show the state of his affections, and they are then received as external manifestations of his mental condition, *and not as evidence of the truth of the facts he states.*" He recognized that when such statements are part of the transaction—the genesis of the will, the *res gestae*—they are admissible as verbal acts, and finally announced the views of this court to be as follows:

"The just result of the whole matter, we think, is, that these declarations, so far as they are relied upon to furnish evidence of the facts they contain, are mere hearsay, and that there is no ground, either of authority or reason, to exempt them from the rule of law excluding all such testimony. We repeat, however, what we have before remarked, that as mere verbal facts, external manifestations of what is passing within, they are always evidence of the testator's intellect and affections for the time being, provided they are of such a character, either by themselves or in conjunction with other evidence, and are so connected with the making of the will in point of time, as to furnish any reasonable ground of judgment in reference to the testator's mental condition at that time."

In Cawthorn v. Haynes, 24 Mo. 236, the very next case decided, this court spoke through the same judge. In that case there was an offer to prove that the tes-

tator on various occasions before the date of the will, and afterwards up to the time of his death, made certain statements deemed by contestants advantageous to them, and on the authority of Gibson v. Gibson, *supra*, it was held that such statements alone and unsupported by other facts do not furnish any legal evidence of undue influence and are not admissible in evidence to prove the fact. In Tingley v. Cowgill, 48 Mo. 291, WAGNER, J., construed the Gibson case as deciding that the statements of testator made before the execution of the will, and standing alone, were inadmissible to prove the fact of undue influence. The Gibson case, never cited without approval, was followed in Spoonemore v. Cables, 66 Mo. 579; in Rule v. Maupin, 84 Mo. 587; in Bush v. Bush, 87 Mo. l. c. 485; in McFadin v. Catron, 120 Mo. l. c. 266; in Schierbaum v. Schemme, 157 Mo. l. c. 16; in Crowson v. Crowson, 172 Mo. 702, and in Seibert v. Hatcher, 205 Mo. *supra.*

The doctrine of these cases is that where there is a charge of mental incompetency to make a will statements made by testator are competent; further, that where such statements are made at the time of making the will they become part of the *res gestae* and admissible; and that where there is an issue upon the state of the affections of the testator they may be admitted on that point, *but they are not to be received or taken as proof of the truth of facts narrated.*

If, therefore, we concede the admissions of the testatrix were to the effect stated, viz., that she was constrained by her other daughters to disinherit Bridget, and that they were exerting an undue influence upon her to that end, yet those statements are not to be taken as true for the purpose of establishing the undue influence and defeating the will; and such is the office assigned them by plaintiff's counsel and assigned to them by the trial judge in setting the verdict aside.

Undue influence need not be shown by direct evi-

dence. It may be shown indirectly and arise as a natural inference from other facts in the case. It must not rest on mere opportunity to influence, or on mere suspicion. There must be somewhere proof of undue influence itself either in fact or presumptively. To be effective, it ought to be sufficient to destroy the free agency of the deceased at the time of making the will. It must not be merely the influence of natural affection; for affection is a stream that presumably flows at all times and its waters are under no ban known to the law. There must be present and in active exercise overpersuasion, coercion or force, fraud or deception, breaking the will power of the testator. [Myers v. Hauger, 98 Mo. 433; Doherty v. Gilmore, 136 Mo. 414; Schierbaum v. Schemme, *supra;* Tibbe v. Kamp, 154 Mo. l. c. 579; Wood v. Carpenter, *supra;* Crowson v. Crowson, *supra;* McFadin v. Catron, 120 Mo. l. c. 275.]

The facts of this case do not bring it within the established rules and we conclude the court erred in setting the verdict aside on the grounds announced and, allowing full force to the doctrine that there is a discretion lodged in the trial judge in granting a new trial, yet that discretion is a judicial discretion and must be reasonably exercised.

The order granting a new trial is set aside and this case is reversed and remanded with directions to the court below to reinstate the verdict and enter a judgment probating the will of Mary McLaughlin in solemn form.

All concur.