OTTO JOHN HENRY LUEBBERT et al.,
Respondents, v. JOHN H. BROCKMEYER et al.,
Appellants.

**St. Louis Court of Appeals, June 6, 1911.**

1. **WILLS: Testamentary Capacity: What Constitutes.** A testator has testamentary capacity if he possesses sufficient mental capacity at the time his will is executed to comprehend all his property and all the persons who reasonably come within the range of his bounty and to understand his ordinary business affairs and know what disposition he is making of his property.

2. ———: **Contest: Testamentary Capacity: Question for Jury.** In a will contest, whether testator had sufficient mental capacity to make a will *held*, under the evidence, for the jury.

3. ———: ———: ———: **Evidence.** In a will contest, where the testamentary capacity of testator, who was more than ninety years of age when he made the will, was in issue, the fact that he became offended without cause at his daughter, who had furnished him a home for nine years, and left her home, and two days before her death again went there to get an article he had left but did not go into the room where she lay, although he knew she was on her deathbed, and the fact that a short while before the death of his wife, with whom he had lived happily for more than fifty years, he left her and took up his abode elsewhere, and was not with her when she died, evince shattered mentality on his part; and these were proper matters for the consideration of the jury on the issue touching his mental capacity.

4. ———: ———: ———: ———. In such a case, the fact that testator changed his will in favor of each person who showed him kindness, as he changed his abode from the home of one son to another and then to that of his neighbors, to whom he left the major portion of his property, is a circumstance suggesting incapacity to appreciate and comprehend the full measure of the importance of the will.

5. ———: **Undue Influence: What Constitutes.** Influence which is gained through kindness alone and springs from fondness or affection is not undue influence sufficient to avoid a will; but the character of undue influence, on account of which the law will invalidate a will, is that which is exercised through persuasion, coercion, force or fraud, to the end of overcoming the free agency or will power of the testator, so as to substitute, in part at least, the will or wish of the person exerting the influence for that of the testator.

Luebbert v. Brockmeyer.

6. ———: Will Contest: Undue Influence: Sufficiency of Evidence: Instructions. In a will contest, evidence *held* insufficient to justify submission of the issue of undue influence to the jury, and the giving of an instruction submitting that issue is therefore *held* reversible error.

7. ———: ———: Undue Influence: Evidence. In a will contest, while undue influence over a testator may be shown by collateral facts and circumstances affording a reasonable inference and need not be proved by direct testimony, there must be something in the case to suggest it, other than a mere opportunity to influence or a suspicion on which to conjecture.

8. ———: ———: ———: Presumption. While the law will presume undue influence in some cases, where a confidential relation obtains between the testator and the person to whom considerable property is given to the exclusion of the natural objects of the testator's bounty, that principle is not relevant to a case where the persons to whom testator willed the major part of his property were simply old friends and neighbors with whom he boarded at the time his will was made and who did not manage or attend to his business affairs nor stand in a confidential relation to him.

Appeal from St. Louis City Circuit Court.—*Hon. Charles Claflin Allen*, Judge.

REVERSED AND REMANDED.

*Geo. W. Lubke* and *Geo. W. Lubke, Jr.*, for appellants.

(1) The test of a testator's competency to make a will is, that he understood the business about which he engaged when he had his will prepared and executed it, knew the persons who were the natural objects of his bounty and understood his relations to them and knew what property he had and the disposition he desired to make of it. Winn v. Grier, 217 Mo. 420; Weston v. Hanson, 212 Mo. 248; Archambault v. Blanchard, 198 Mo. 384; Sayre v. Trustees Princeton University, 192 Mo. 95; Story v. Story, 188 Mo. 110; Hamon v. Hamon, 180 Mo. 685; Crowson v. Crowson, 172 Mo. 691; Wood v. Carpenter, 166 Mo. 465; Riggin v. Westminster College, 160 Mo. 570; Sehr v. Linde-

mann, 153 Mo. 276; Riley v. Sherwood, 144 Mo. 355; De Veld v. Judy, 143 Mo. 348; Cash v. Lust, 142 Mo. 630; McFadin v. Craton, 120 Mo. 253; Maddox v. Maddox, 114 Mo. 47; Couch v. Gentry, 113 Mo. 248; Jackson v. Hardin, 83 Mo. 175. (2) The influence exerted upon a testator which is sufficient to invalidate his will must be such as amounts to over persuasion, coercion or force, destroying the free agency of the testator, and not merely the influence of affection or attachment or the desire of gratifying the wishes of one beloved, respected and trusted by the testator. Conner v. Skaggs, 213 Mo. 234; Weston v. Hanson, 212 Mo. 248; Teckenbrock v. McLaughlin, 209 Mo. 533; Seibert v. Hatcher, 205 Mo. 101; Cowan v. Sharer, 197 Mo. 203; Campbell v. Carlisle, 162 Mo. 633; Riggin v. Westminster College, 160 Mo. 570; Martin v. Bowdern, 158 Mo. 379; Schierbaum v. Schemme, 157 Mo. 1; Sehr v. Lindemann, 153 Mo. 277; Maddox v. Maddox, 114 Mo. 35; DeFoe v. DeFoe, 144 Mo. 545; Cash v. Lust, 142 Mo. 630; Jackson v. Hardin, 85 Mo. 175. (3) Instruction numbered 9, given for the plaintiff, is erroneous in that it requires the jury to find the testator capable of "sustained thought" concerning his property and the persons entitled to his bounty as a requisite to testamentary capacity. See authorities cited under point 1; Couch v. Gentry, 113 Mo. 248; Lorts v. Wash, 175 Mo. 487. (4) Instruction numbered 11 given for the plaintiffs is erroneous in that it undertakes to enlarge the issues made by the pleadings, by putting before the jury the issue of whether "those about the testator or any of them" exercised any influence over the testator to procure the will in question, whereas the petition charges the will to have been the result of the undue influence of the defendant John H. Brockmeyer and Wilhelmina C. Brockmeyer only. Wallack v. Transit Co, 123 Mo. App. 160; State ex rel. v. Dieckman, 124 Mo. App. 653; Feddeck v. Car Co., 125 Mo. App. 24. (5) Instruction numbered 12 given

for the plaintiffs is erroneous because not predicated on the evidence. There was no evidence of any undue influence over the testator as charged in the petition. See authorities collected under points 2 and 4.

*Rassieur, Kammerer & Rassieur* and *Schnurmacher & Rassieur* for respondents.

(1) Under the evidence, the court properly submitted the case to the jury on the issue of mental capacity. Holton v. Cochran, 208 Mo. 314. (2) Also properly submitted the case on the issue of undue influence. Undue influence need not be established by direct or positive evidence; the facts and circumstances may be such as to warrant its inference. Mowry v. Kettering, 204 Mo. 173; Bradford v. Blossom, 190 Mo. 110; King v. Gilson, 191 Mo. 307. And where, as in the case at bar, a confidential relation is shown, and the bulk of the estate is given to strangers in blood, undue influence will be presumed as a matter of law. Harvey v. Sullens, 46 Mo. 152; Dingman v. Romine, 141 Mo. 466; Mowry v. Kettering, 204 Mo. 173. (3) Instruction No. 9, given for plaintiffs, correctly states the law. The mental capacity of a testator must be more than momentary; it is not enough that testator may have spasmodic flashes of intelligence sufficient to know his property, the natural objects of his bounty, etc.; he must know and retain the facts sufficiently long to be capable of understanding them and the act in which he is engaged; and that, moreover, without the prompting or aid of others. Crossan v. Crossan, 169 Mo. 631; Holton v. Cochran, 208 Mo. 422; Converse v. Converse, 21 Vt. 168; Roller v. Kling, 150 Ind. 159; 1 Woerner, Amer. Law Adm., sec. 23; 1 Redfield on Wills, sec. 15, subdiv. 9. (4) Instruction 11, given for plaintiff, is a correct and approved statement of the law. Moore v. McNulty, 164 Mo. 111. (5) Marked changes in a testator of mature years and in his love and affection for his chil-

dren are of themselves strong evidence of his unsoundness of mind.  Holton v. Cochrane, 208 Mo. 418.

NORTONI, J.—By this suit plaintiffs contest the last will and testament of John Henry Luebbert, deceased.  The jury found the issues for plaintiffs and against the will, and defendants prosecute the appeal.

The will and codicil thereto in contest were respectively executed by John Henry Luebbert, a man more than ninety years of age, within six and three months prior to his death, and by the provisions thereof the major portion of his estate was bestowed upon defendants, John H. Brockmeyer and wife, to the exclusion of the testator's two sons and daughter who contest the same.  The petition declares against the alleged will and codicil attached upon two grounds: First, that the testator was not possessed of sufficient mind and memory at the time of the execution of those instruments to dispose of his property; and second, upon the ground that he was unduly influenced thereabout by defendants, John H. Brockmeyer and wife, Wilhelmina, both of which grounds were submitted to the jury by instructions.  It is argued the evidence is insufficient to support the judgment on either score and it will therefore be necessary to set forth the facts with some detail.

It appears the testator, John Henry Luebbert, had resided in the city of St. Louis for about sixty years prior to his death, which occurred in October, 1906.  He was a German, but entirely familiar with the English language, though uneducated; a boss plasterer by trade and a man of considerable force.  His family consisted of a wife, who departed this life about eighteen months before he did, somewhere near eighy-five years of age, and two sons and two daughters.  One of his daughters, Mrs. Walters, died about 1902 and his other daughter, Mrs. Bell, formerly Hanson, resides in the west where she has been for twenty or

twenty-five years, while his two sons, John Henry and Edward Luebbert, reside in the city of St. Louis. We infer from the evidence the sons and daughters are aged from forty to fifty-five years and that the estate involved does not exceed five thousand dollars in value, the principal portion of which is evidenced by a note which the testator held against a church congregation in St. Louis. The testator had been unable to work at any calling for probably ten years prior to his death because of advanced age and decrepitude. For about nine years he and his wife, who was sorely crippled with rheumatism, lived with their daughter, Mrs. Walters, a widow, until she died in the summer of 1902, and thereafter they resided for something more than a year with his nephew, but in 1904 removed, at the instance of the younger son, Edward Luebbert, to his home where they remained for about a year, when Mrs. Luebbert, the old lady, died. At this time, the testator was more than eighty-nine years of age and until about the time of the death of his daughter, it appears he had always been fond of the members of his family and on good terms with each. A couple of weeks prior to the death of his wife, he took offense at some trivial matter and moved his abode to the home of his older son, John Henry. Upon coming into his house, he said to his elder son that he was not being treated right at Ed's and had therefore moved over with him and had brought his trunk along, holding up a red bandana handkerchief in which was contained a few articles of apparel, which receptacle he denominated as his trunk. John Luebbert told the old gentleman he was welcome to remain there and so he did. Indeed, it appears he did not even return to see his wife who was sick at Ed's, and, though he inquired about her, he expressed no desire to see her and was not present when she died. He attended the funeral, however, and remained at the house of his son Ed, where his wife had died, for some time after. About

the middle of March, 1906, he became offended at his son Ed because he would not allow him to go out into the street without either a coat or hat and shovel snow off of the sidewalk about six o'clock in the morning. Ed instructed the old gentleman that he was not able to withstand the inclemency of the weather, so clad, and upon being positive with him about it, the old gentleman took umbrage and pouted. He pouted around the house for several days because of this and finally moved over to his old neighbor, Brockmeyer's, where he made an arrangement for board and lodging at twenty dollars per month. Mr. and Mrs. Brockmeyer, defendants, were old neighbors and friends of deceased and had been for more than fifty years, and it appears that during all of these years they had been on terms of intimacy. Indeed, it is in evidence that defendant John H. Brockmeyer was the closest friend the testator had outside of his family and that the testator was equally as fond of Mr. Brockmeyer. The testimony of Brockmeyer goes to the effect that he endeavored to persuade the old gentleman to remain with his son Ed but as he insisted he was going to move some place and appealed to Brockmeyer on the grounds of old friendship, he finally consented to take him. After the testator had been at Brockmeyer's home for some two or three weeks, he said to Brockmeyer that he was getting old and would need attention and he would like to remain there the balance of his life and to be buried from his house and if they would take good care of him, he would give them something besides paying his board. The old gentleman seemed to enjoy his home at Brockmeyer's more than with his son because Mr. and Mrs. Brockmeyer would talk to him and play cards with him the while. He was an inveterate card player and fond of the game though he never gambled. He was an uneducated man and was unable to entertain himself except by playing cards or talking to others. After he had boarded at

Brockmeyer's two or three weeks, he went to the office of his attorney in company with Mr. Brockmeyer and requested that his will be drawn. His attorney prepared the will at the instance of the testator in the manner dictated by him. By its provisions, a bequest of $1000 was made in favor of his son, John Henry Luebbert, and $1000 in favor of his son, Edward Luebbert, and $200 in favor of his daughter, Christina Hanson, and one dollar in favor of his grandson, Harry Walters, while his bed and bedding and a few articles of household furniture were bequeathed to Mrs. Wilhelmina Brockmeyer, and all of the residue of his estate, after paying all of his debts and funeral expenses, was bequeathed to John H. and Wilhelmina Brockmeyer, share and share alike. Afterwards, July 5, 1906, testator called again at the office of his attorney in company with Mrs. Brockmeyer, produced the former will which he carried in his bosom and requested the counsel to rewrite it identically as before save that his two sons should receive $500 each instead of $1000. His attorney suggested that he did not want to write the will again but the testator insisted he should do so, and it appears that though Mr. Brockmeyer was present on the former occasion and Mrs. Brockmeyer on this one, neither said a word on the subject one way or the other. As before said, the old gentleman was more than ninety years of age at the time the will and codicil were executed, for at the time of his death in October, he had reached the advanced age of ninety-one years, one month and five days. The record abounds with proof even on the part of contestants to the effect that he was a man of strong character and great will power but irascible and erratic. He was positive in his convictions and could not tolerate a difference of opinion. He was very hard of hearing and suspicious of those around him because he could not hear all that was said. He was sensitive and touchy, took offense and became angered at most tri-

vial matters during the last two or three years of his life. Indeed, besides manifesting numerous eccentricities, he seemed to evince an utter change of disposition toward members of his family as early as 1902, for he became offended at his daughter, Mrs. Walters, while she was on her death bed with consumption, only a couple of weeks before she died, and left her house over a most trivial occurrence, after residing there for nine years. After leaving Mrs. Walters' home, where his wife remained, he went to his son Edward's and returned to Mrs. Walters' after a pair of slippers only two days before she died and though he knew she was under the spell of immediate dissolution did not even go into the room to see her; but he attended her funeral. He was absent, too, from his wife (who died at the home of their son, John, about eighty-five years of age) at the time of her passing, but nothing indicates that he had any reason for an unkind feeling toward her. There is proof from a number of witnesses who had known the old gentleman for many years to the effect that during the last year or two of his life he would wander away from home and become lost in the streets of the city within from three to eight blocks of where he had lived for sixty years. One witness, a business man, who had been reared within three or four houses of the testator and had been acquainted with him through all of the years of the life of the witness, says he met him one day on the street but a few blocks from home with a chip basket on his arm. Upon observing that he appeared to be lost, he addressed the old gentleman and he did not know him. After the witness informed him who he was, the old gentleman giggled and said he was going out to buy some woolen socks, though, the witness said, it was summer time and such socks were not in order. The witness took the old gentleman home in a carriage as he seemed to be wandering around and did not know where he was going. Several other wit-

nesses gave testimony to the effect that they had met him at different times on the streets within a few blocks of his home, and upon inquiring his destination, he informed them he was going home, when he was moving in the opposite direction. These witnesses also took him home to his son, Ed's. A number of witnesses say that during the last two or three years of his life testator was unable to talk connectedly on any subject but would ''drift and ramble'' in a conversation as though he was ''off his noodle,'' in the language of one witness. On one occasion he passed his son John on the street in front of his place of business and, though he looked him in the eye, did not recognize him. It appears, too, that during the same conversation he would repeatedly inquire of old friends what business they were engaged in, etc. One witness who occupied the same room with him at his son Ed's, a few months before he executed the will in April, said the old gentleman would frequently get up in the night and get down on the floor and look under the dresser and into the corners of the room as if he were looking for something. This would occur at different hours of the night—midnight, two or three o'clock in the morning, etc., and upon the matter being mentioned the next day, the old gentleman would seem not to remember it. There is evidence that he was tolerably strong and vigorous, and there is abundance of evidence, too, that he was physically very frail and declined rapidly for two or three years before his death. He was an active man and no doubt of much natural force, for his predisposition was to be ever engaged at something if it were nothing more than sweeping or aiding in washing dishes, etc. The proof abundantly shows that his children were not unkind to him, though it does appear they were probably not as thoughtful of his comfort as they should have been. His sons would sometimes argue matters with him during his declining years but soon receded from any

position they took because of the old gentleman's obstinancy. But nothing appears in the record suggesting any valid reason why the affections of the parent should be greatly diminished toward any of his children other than probable hallucinations of an undue imagination or distorted fancy.

It appears in 1886 the old gentleman loaned $8000 to a church congregation and held a note executed by some of his old time friends therefor. Though this money was loaned for a specified term and the note renewed occasionally, he was paid, besides the interest semi-annually, the sum of $100 or $200 or $300 at a time as he needed money, during all of the years from 1886 to the time of his death in 1906. By such small payments, the note had been reduced to about $4200 at the time of his death. The old gentleman could not read or write and therefore trusted the treasurer of the church implicitly during all of these years until within a year of his death when he became somewhat suspicious without any cause therefor whatever. About the time he made the will in April, 1906, he called upon the church treasurer for some explanation touching this fund and a new note given with respect of the sum, recently before. Of course, this matter amounts to nothing save as a slight circumstance tending to show his mental condition compared with that which obtained during the entire course of transactions had theretofore. During the seven months the testator resided at Brockmeyer's before his death, his son John Henry called to see him but twice and his son Edward once only. Edward came in company with his wife in a carriage a few days before the old gentleman died and endeavored to persuade him to return to his home, but the testator refused and said he was happy and comfortable there and intended to remain. Upon Edward's insisting he should return to his house, the old gentleman became positive as usual and spoke with such emphasis as to suggest that he had a

just grievance, and the evidence shows none whatever. There is proof that the old gentleman said to several persons during the last year or two of his life that his sons cared nothing for him save to get his money and there is nothing in the case suggesting such to be the fact. But it does appear his son Ed borrowed $400 from him some two or three years before, which he employed in his business. During the two or three years before, it appears the testator had executed two previous wills,—the one while he resided with his son John gave practically all his estate to John and a small sum only to Ed; the other while he lived with Ed gave the major portion to him and but a small amount to John. Testator's daughter, Mrs. Bell, (mentioned in the will as Christina Hanson, the name of her former husband) it appears had resided in the west for many years, and while it is clear her father did not know her present address at the time the will was made, it is not clear whether he knew her name was Bell by a subsequent marriage, and in this state of the proof the circumstances of misnomer is of but slight importance, for it appears he remembered her at least as a natural object of his bounty. While there is persuasive, if not convincing, evidence that the old gentleman was competent to make a will at the time both the will and the codicil were executed, there is, indeed, much tending to show that he was not; for besides the testimony as to what may be termed mere eccentricities, there appears the story of witness after witness to the effect that the testator was frequently lost on the streets in the immediate neighborhood where he had lived for sixty years and that, as a witness expressed it, he was frequently "off his noodle." No one disputes that his physical strength was much impaired and that he was unable to go about much alone for a year or two before his death. The attending physician says he died from a general breaking down of the physical powers resulting from senile debility.

Aside from his extraordinary will power and apparent inclination to be obstinate, which were obviously vigorous in themselves, the proof suggests that his other mental faculties were considerably impaired and it is doubtful if both his judgment and reason were not involved.

Unless we are able to say as a matter of law that it appears from these facts the old gentleman was, at the time of executing the will and codicil (the one about six and the other three months before his death), capable of comprehending all his property and all of the persons who reasonably came within the range of his bounty and that he possessed sufficient intelligence to understand his ordinary business affairs and to know and understand what disposition he was making of his property, the verdict of the jury should not be disturbed on this score, for such are the requisite qualifications as to mental capacity for the testamentary disposition of property. [Maddox v. Maddox, 114 Mo. 35, 21 S. W. 499; Riggin v. Westminster College, 160 Mo. 570, 61 S. W. 803; Holton v. Cochran, 208 Mo. 314, 410, 106 S. W. 1035.] We are unable to so declare, for all of these matters, when considered together with the fact that the testator was an old man more than ninety years of age at the time the will was made and that he practically disinherited the natural objects of his bounty without apparent cause and purported to confer the major portion of his estate upon strangers of blood, are for the consideration of the jury. Especially is this true in view of the uncontradicted proof that, notwithstanding the pleasant relations which had always existed in the family, the old gentleman suddenly revealed a harsh and cruel side during the last sickness of both his daughter and his wife. Such conduct is so extraordinary, when considered in connection with all of the proof touching his prior kindly intercourse with his family, that it suggests an entire change of mental condition. It seems that,

without cause, he became offended at his daughter, who
had furnished him a home for nine years, only a few
days before her death and uneremoniously left her
house but two weeks before her passing, when he knew
her dissolution was immediately expected. Two days
before her death, he visited her home to get a pair
of slippers and did not so much as go into the room
where she lay. It is true this occurred in the summer
of 1902 but it nevertheless suggests a change in the
impulses of heart and mind so entirely inconsistent
with his former state as to invite serious considera-
tion by practical men. The same may be said with
respect to the last illness of his wife, who was about
eighty-five years of age, for after having lived happily
with her more than fifty years it seems the old gentle-
man utterly abandoned her side at the last hour and
took up his abode with a son in another part of the
city. Though he inquired about her condition, he ex-
pressed no desire to see her and seems not to have
been deeply interested, and was not present when she
died. Such a remarkable change of mental attitude
without cause toward loved ones by one from eighty-
six to ninety years of age forcefully evinces shattered
mentality, for it would be most unjust to denounce a
good man possessed of all his powers as so awfully
cruel. Matters of this character, together with other
facts and circumstances in the case, are for the con-
sideration of the jury on the issue touching mental
capacity. [Holton v. Cochran, 208 Mo. 314, 106 S. W.
1035.] The fact that this old man changed his will
in favor of each person who showed him kindness as
he changed his abode from the home of one son to
another and to his old neighbors, the Brockmeyers, is
a circumstance suggesting incapacity to appreciate
and comprehend the full measure of its importance.
It is unnecessary to discuss this feature of the case
further than to say on the facts and circumstances

above recited we are unable to declare as a matter of law that the testator possessed sufficient mental capacity at the time either the will or the codicil was executed to be capable of comprehending all his property and all of the persons who reasonably come within the range of his bounty and that he had sufficient intelligence to understand his ordinary business and know what disposition he was making of his property.

Though the evidence suggests the mind of the testator in the instant case to be a fertile field for the influence of designing persons, no substantial evidence of undue influence appears in the record. After having twice read the entire evidence, we have been unable to discover anything more than the ministrations of kindness on the part of defendants toward an old friend which induced him to make them the recipients of his bounty. Influence which is gained alone through kindness and springs from the fondness of affection is not of that character which the law condemns as undue and because of which a last will and testament may be set aside. [Campbell v. Carlisle, 162 Mo. 634; In the matter of Gleespin's Will, 26 N. J. 523; Mackall v. Mackall, 135 U. S. 167.] The character of influence which the law denounces as undue and on account of which the will of the testator is invalidated is that which one exercises through persuasion, coercion, force or fraud, to the end of overcoming the free agency or will power of the testator so as to substitute in part at least his will or wish in the matter for that of the testator. It is because of such influence alone, as contradistinguished from that which is acquired through mere kindness, affection or attachment, that the law denounces an instrument not the last will and testament of the testator. [Winn v. Grier, 217 Mo. 420, 117 S. W. 48; Teckenbrock v. McLaughlin, 209 Mo. 533, 550, 551, 108 S. W. 46.] There is not a particle of proof in the record that either defendant Brockmeyer or wife ever made any suggestion to Mr. Luebbert

about his will except that when Luebbert mentioned that he intended to make them the recipients of his bounty Mr. Brockmeyer said he had better give his property to his children. It is true Brockmeyer himself accompanied the testator to the office of testator's attorney when the will was made, but the proof is conclusive that he said nothing about it and made no suggestion at the time. The testator himself directed the matter and but a slight inference may arise from the fact Mr. Brockmeyer accompanied the testator to the office of the attorney, when it is remembered that because of his extreme age he was unable to go around by himself. The same may be said with respect to the occasion of the codicil when Mrs. Brockmeyer accompanied the testator to the same office on a like mission, for from the evidence it is clear that she said nothing about the codicil one way or the other and did not even know its contents until after its completion. There is evidence that the testator's son John called upon him twice and his son Ed once during the seven months he lived with the Brockmeyers and that they had no opportunity to talk with their father alone as Mr. or Mrs. Brockmeyer was present each time. This amounts to nothing whatever as tending to prove undue influence, for it appears the visits were made to the home of defendants and each visit was of but short duration, not exceeding thirty minutes to an hour, and the sons made no effort to have a private interview which was prevented. No witness suggests that either Mr. or Mrs. Brockmeyer sought to persuade, coerce or restrain the testator in any respect. Indeed, every inference from the testimony on both sides seems to suggest that defendants were very kind and indulgent and permitted the old gentleman to exercise his free will and agency about everything. While undue influence may be shown from collateral facts and circumstances affording a reasonable inference to that effect and need not be proved by direct

testimony, there must be something in the case to suggest it other than a mere opportunity to influence or a suspicion on which to conjecture. [Teckenbrock v. McLaughlin, 209 Mo. 533, 550, 551, 108 S. W. 46.] Recognizing the dearth of evidence, or circumstances for that matter, from which undue influence can be inferred, plaintiff's counsel argue that the court should declare a confidential relation obtained between defendants and the old gentleman as if he were their ward and therefore undue influence should be presumed in the situation of the parties. While the law will presume undue influence in some cases, where a confidential relation obtains between the testator and the person to whom considerable property is given, such as the guardian, adviser, attorney, physician or business manager, to the exclusion of the natural objects of the testator's bounty, the principle is not relevant here. Because of such confidential relations, the law looks with suspicion upon wills so made and places the burden of proof to the effect that no undue influence was exerted on the proponent, but that no such relation appears between these parties is entirely clear. [See Campbell v. Carlisle, 162 Mo. 634, 63 S. W. 701.] Defendants did not manage or attend to the testator's business affairs and no such confidential relation existed but instead he was only their boarder, and all were friends. The Brockmeyers appear to be good, old-fashioned German people who for half a century were on terms of neighborly intimacy with the testator. For all of these years they had visited each other and the two old gentlemen were boon companions. It appears that at the time the will and codicil were made Mr. Brockmeyer was about seventy-six years of age and his wife was an old lady as well. They entertained the testator as best they could by helping him about, going with him for rides on the street car; amused him by playing cards, etc., while for his board and the comforts of home he paid twenty dollars per

month.  When he was sick, they cared for him with kindness and affection and on his ninety-first birthday —but a month or so before his death—permitted him to give a party at their house to old friends and neighbors.  The expense of this birthday party, which it appears was about thirty dollars, the old gentleman paid from his own means, but as to the entertainment of the twenty guests who were present, all of the Brockmeyer family participated.  All of these things evince no more than commendable acts of kindness on the part of good people endeavoring to make the last days of the old gentleman's life as pleasant as possible.  As we view it, there is naught in the record affording a reasonable inference of undue influence in the sense of the law, and the court erred in submitting this matter to the jury as a ground upon which it could say the will was not the result of his free agency.

It will be unnecessary to notice other errors complained of as new instructions will essentially be drafted on a retrial.  For the error of submitting the question of undue influence to the jury, the judgment should be reversed and the cause remanded.  It is so ordered.  *Reynolds, P. J.,* and *Caulfield, J.,* concur.