Rosgard JOHNSON, as administrator of the estate of Ole Johnson, deceased, and individually, Jorgina Johnson, Andor Johnson, Melvin Johnson, Leo Johnson, Roy Johnson, Delia Mortenson, Winfred Johnson, Cecelia Opdahl, Franklin Johnson, and Clifford Johnson, Plaintiffs and Appellants,

v.

Victor JOHNSON, Defendant and Respondent.

No. 7574.

Supreme Court of North Dakota.

March 18, 1957.

On Rehearing Oct. 8, 1957.

A. S. Benson, Bottineau, Duffy & Haugland, Devils Lake, for appellants.

Halvor L. Halvorson, Jr., and Jonathan C. Eaton, Jr., Minot, for respondent.

JOHNSON, Judge.

This is an action to quiet title to the following described real property in Bottineau County, North Dakota, to wit:

"The South Half of the Southeast Quarter and the Northwest Quarter of the Southeast Quarter of Section Seven, Section Seventeen, the West Half of Section Sixteen, the Northeast Quarter, the Northeast Quarter of the Southeast Quarter, the East Half of the Northwest Quarter, less 23.21 acres conveyed to the United States, and the South Half of the Southeast Quarter, less 32.58 acres conveyed to the United States, of Section Nineteen, and the Southwest Quarter, the West Half of the Northwest Quarter, the Southeast Quarter of the North West Quarter, the South west Quarter of the Northeast Quarter and the West Half of the Southeast Quarter of Section Twenty, all in Township One Hundred Sixty-one North, of Range Seventy-eight West of the 5th. Principal Meridian."

The real purpose of the action is to cancel and set aside a warranty deed executed by Ole Johnson on September 4, 1951, to himself and to his son Victor Johnson, as joint tenants and not as tenants in common, with right of survivorship. Originally when this action was started it included the Northeast Quarter of the Northwest Quarter (NE¼ NW¼), the North Half of the Northeast Quarter (N½ NE¼), and the Southeast Quarter of the Northeast Quarter (SE¼ NE¼) of Section 20, Township 161, North of Range 78. This real property had been purchased by the defendant from third parties. During the trial it was stipulated that this property was not to be involved in the determination of this action, and that the plaintiffs did not assert any title thereto.

The action was tried to the court without a jury. The plaintiffs attacked the validity of the deed of September 4, 1951, on two grounds: first, that the deceased,

Ole Johnson, at the time of the execution of the deed was not competent and lacked the mental capacity to execute the same; second, that he executed the deed under the undue influence of his son, Victor Johnson..

The trial court in a comprehensive memorandum opinion analyzed the facts presented, found the deed to be valid, and ordered judgment for the defendant. The plaintiffs appeal from this judgment and demand a trial de novo.

In discussing the evidence presented at the trial, the court said:

"* * * The record has been searched in vain for any evidence of any actual fraud practiced upon the deceased by the defendant in procuring the deed, and while the deceased, Ole Johnson, may have been influenced to some extent by the defendant, the Court does not feel that it can be properly held to be undue influence as would warrant a Court in disturbing the transaction. There is nothing in the evidence in this case to indicate undue influence, that is, influence that is unrighteous, illegal, or designed to perpetrate a wrong, or of such character to amount to fraud or coercion, or that the grantor was overreached and deceived by any false representation or strategem or by coercion, physical or moral, or that the said Ole Johnson at the time of the execution thereof was so weak mentally as not to be able to comprehend the nature and effect of the transaction involved."

The trial court found as ultimate facts:

"IV

"That the said Ole Johnson, grantor in said joint tenancy deed, at the time of the execution thereof, namely, September 4, 1951, was mentally competent to make and execute said deed, and that he fully knew and understood the meaning and effect of said deed and what was conveyed thereby, and .

was able to and did exercise his own free will in making said conveyance.

## "V

"That no undue influence or fraud was exercised by the defendant, Victor Johnson, over the said Ole Johnson, now deceased, in connection with the transaction regarding the inception or execution of said joint tenancy deed covering the above described property."

In the case of Doyle v. Doyle, 52 N.D. 380, 389, 202 N.W. 860, 863, this court discusses the advantages of the trial court in considering the evidence as compared with the cold record from which we must arrive at our findings. In that case the court said:

"The case is here for a trial de novo under section 7846, C.L.1913, as amended (now Section 28–2732, ND RC 1943). This court must review the record here presented and find the facts for itself. On a trial de novo the findings of the trial court are not clothed with the same presumptions in their favor as in other cases. But, on the other hand, in such a case as this, we must take into consideration the fact that we have here but a cold and lifeless record. We are called upon to determine the mental capacity, the state of mind, the knowledge and intent of Ellen Doyle at the time she executed and delivered the deed. We have not the advantage of seeing her, of noting her demeanor, of hearing her voice; of the innumerable intangible indicia that are so valuable to a trial judge in determining questions of this character. The trial court had the advantage of all of these things, and, breathing the air of the trial, he was in an immeasurably better position to find the real facts in the case. Therefore, notwithstanding that the case is here for trial de novo, we must give some appreciable weight to the determination of the trial court." See also Merchants' National Bank of Willow City v. Armstrong, 54 N.D. 35, 208 N.W. 847; Gunsch v. Gunsch, N.D., 67 N.W.2d 311.

We will now proceed to review the evidence to ascertain whether the deed is voidable because of incompetency of the grantor or undue influence to which he may have been subjected.

Ole Johnson, at the time of this death, was over 90 years old. He died June 24, 1954, two years and nearly ten months after the execution of the deed in question in this action. He was the father of twelve children, eleven of whom were originally made plaintiffs in this action. However, it appears that Delia Mortenson claims that she was made a party plaintiff without her consent. The attorneys for the plaintiffs moved, during the course of the trial, to withdraw her name as plaintiff in the action.

Ole Johnson was an early pioneer of Bottineau County. He was aggressive, and a man of positive character. He was public spirited and interested in public affairs. He had some fifty years previous to his death helped organize Starbuck Township in Bottineau County, North Dakota, and was a member of its township board until 1950. During his active years, he was considered the "kingpin in the community." His son Victor, the defendant in this action, was the youngest of the 12 children. He had always lived on the home farm with his father and was living with him at the time of Ole Johnson's death. Ole Johnson lost his wife in 1941. He and his son Victor continued to reside on the home farm and to operate it. Occasionally some of his daughters would go out to the farm to assist him and Victor with some of the household work. All of the children had stayed at home to help on the farm until they were grown up and mature men and women. They cooperated with their parents and helped Ole Johnson with the farm work without receiving any

wages. Their father gave them spending money. When the children left home to establish themselves or were married, the evidence shows that Ole Johnson helped them in varying degrees.

Ole Johnson suffered a stroke on January 6, 1948. This resulted from hypertension and high blood pressure, arteriosclerosis. He was not hospitalized at the time of this stroke. On April 23, 1949, he suffered a second stroke, and at that time was hospitalized until May 26, 1949. On December 9, 1949, he was again hospitalized for treatment of sores about the neck and ears. He was discharged December 17, 1949. He was again hospitalized on February 25, 1950, for eczema and lesions on his stomach and was discharged March 6, 1950.

The two strokes which Ole Johnson suffered in 1948 and 1949, constitute the primary basis for the contention of the appellants that thereafter he was incompetent to transact any business; that he had no mental capacity to do so; that in fact he did not transact any business, all business transactions in connection with the farming operations of Ole Johnson being carried on by Victor Johnson. None of the children made any claim as to the incompetency of Ole Johnson until this action was commenced. No effort was made by any one of them to appoint a guardian over his person or estate.

Dr. Melvey of Bottineau acted as the personal physician of Ole Johnson from about 1942 to and including April 20, 1949. We have no direct medical testimony as to the effect of the second stroke in April 1949 upon the physical and mental condition of Ole Johnson. After the first stroke, Dr. Melvey testified that Ole Johnson for a short time had double vision. With glasses, however, he could see. He also testified that the cause of Ole Johnson's death was hardening of the arteries or arteriosclerosis. He was asked:

"From your attendance on Ole Johnson and your observations of his ac-

tions is it your opinion, Doctor, he was deficient mentally in any respect? A. My opinion is that he was adequate mentally except for periods when his blood pressure would rise and he would have very severe headaches."

These severe headaches came at about six month intervals and would last about 48 hours. During the headaches his blood pressure would rise. The Doctor was also asked:

"And does this condition (hardening of the arteries or arteriosclerosis) necessarily have any effect on the mental capacity of the party? A. Not necessarily."

He also testified that he did not believe that the hardening of the arteries affected Ole Johnson's mental capacity. It is clear from the testimony of Dr. Melvey that it was his belief that the affliction of Ole Johnson and the first stroke did not affect his mental capacity.

A Dr. Robert Johnson was called as an expert witness. While the trial court indicated that his testimony was not of much assistance in its determination of the facts in this case, yet it is worthy of note that Dr. Johnson testifying on the basis of hypothetical questions, which recited the medical history of the first and second stroke of Ole Johnson, stated practically the same conclusions as had been reached by Dr. Melvey. On cross-examination he testified:

"And the mere fact the person had strokes or even say two strokes would not necessarily render him mentally incompetent would it? A. No, it would not.

"Q. Nor render him incapable of handling his affairs, that right? A. No, it would not, it would depend on severity of stroke."

While we have no direct medical testimony on the severity of the 1949 stroke which Ole Johnson suffered, it is apparent

that at least to a considerable degree, he recovered. He was in the hospital a little more than one month. Then he stayed with his son Clifford for a while and also with his daughter Mrs. Mortenson. But he seemed anxious to get back to the farm. The evidence shows that after the 1949 stroke he was able to get about, that he took part in many minor activities. Although he was no doubt weaker and less vigorous physically after the 1949 stroke, he seemed to enjoy company and was happy when people came to visit. He could not and did not converse freely as his hearing was progressively becoming worse. Accordingly it was also harder for people to converse with him. He went to town frequently with Victor and would go buy himself a cup of coffee. He did chores around the house such as washing the dishes, sweeping the floors, making coffee and otherwise exhibited about a normal amount of physical energy and activity common to people of his age. As far as the evidence goes, the greatest change in Ole Johnson took place the last two years that he lived.

Victor Johnson admitted that after 1949 his father took no active part in the management and operation of the farm or the business connected therewith. Victor looked after selling the grain, obtaining loans thereon, making out the income tax returns, buying machinery and the necessities for the house, and generally looked after all other matters that needed attention. Victor, although admitting that his father was getting harder of hearing as he grew older and that it was difficult to converse with him, stated that his father told him to sell the grain and that they talked over other matters of business.

It is not clear when a joint bank account was established by Ole and Victor Johnson. It may have been prior to the execution of the joint tenancy deed on September 4, 1951. But after that time or prior thereto, the farm was operated and the proceeds therefrom placed in a joint banking account. If the joint bank account was established prior to the date of the deed, it is some evidence of the confidence that Ole Johnson had in his son Victor and is an indication that father and son were closely associated and that, at least as to the joint bank account, they considered that the proceeds of the farm belonged to both.

It is strenuously urged that the discontinuance of all business activities by Ole Johnson after the 1949 stroke is evidence of his complete incompetence and incapacity. He did not run for reelection to the township board in 1950. Some of his neighbors, who were also members of the township board, testified that the last couple years that Ole served on the board, he was not as alert as he had previously been; that he slept a good deal at the meetings, and generally did not show the interest in township affairs that he had exhibited in the days of his physical vigor.

Ole Johnson quit driving his car to town in 1947 or 1948. He ceased operating it around the farm in 1950. It is urged that by this, he himself indicated that he was no longer competent. While these things may indicate that Ole Johnson himself recognized that to some extent he was losing some physical vigor, they also indicate prudence on his part and the fact that he had forethought, comprehension and realization that he should not engage in hazardous tasks. The management of the farm by his son Victor may be attributable to the fact that Ole Johnson knew that his son was not only capable of managing it, but that he had confidence in him to do so, and realized that with his declining vigor and difficulties of hearing it was best to allow Victor to manage and operate the farm. His trust and confidence in Victor did not make it necessary for him to attempt to exert himself in that direction in his last declining years.

Victor at the time of the trial was a man 41 years of age. He had spent all his lifetime on the farm. He had lived with his father about 13 years from the date of the

death of his mother. He was undoubtedly in closer contact with his father than any of the other children. While Franklin and Melvin, Ole's sons, stayed on the farm at different times and helped with the work, the evidence shows that Victor was the only one of the sons that lived with Ole continuously and assisted him until his death. Franklin had stayed at home until 1935, and worked with his father off and on until 1953.

·If the evidence given by Victor Johnson, W. H. Adams, and Delia Mortenson is credible, and we believe it is, their testimony indicates that Ole Johnson had formed an intent to convey his property to his son Victor years before he carried that intent into execution. Victor testified that his father had told him when he was a young man about 17 years of age, that he would leave him his property if he stayed with him on the farm. All through the years he never received any set wages, but was given spending money. Delia Mortenson gave testimony that corroborates Victor's showing the intent of the father. It must be remembered that she was testifying against her own best interests. She was asked if she realized that and she answered affirmatively. She related an incident involving the purchase of an airplane by Victor in 1947. Ole Johnson, her father, apparently was apprehensive about this purchase and talked the matter over with Mrs. Mortenson. She indicated to her father that it was perhaps not any more dangerous to operate an airplane than a car. In the conversation concerning the airplane purchase, after the father had determined to allow Victor to buy it, he said: "What was his is mine, what is mine was his."

On September 4, 1951, while Victor Johnson and his father were on their way to Bottineau, according to Victor, the father suggested that he wanted to consult a lawyer and have a deed drawn. He told Victor what he wanted, and asked him to take him to attorney W. H. Adams. Mr. Adams had known Ole Johnson for many years, probably from 20 to 30 years. He had come to know him while campaigning in Starbuck Township. While Mr. Adams does not remember all the details involved in the drawing of the deed here in question, he does remember that Ole Johnson was the one that carried on the conversation with him concerning the transaction. He remembered that because he happened to know that Ole Johnson was "The King of the Tribe" and the children did not tell him what to do. While that memory of Ole Johnson may relate to an acquaintanceship of years gone by, it is noted that Mr. Adams could not see or detect in the behavior of Ole Johnson any great difference from Ole's behavior as he remembered him in the past. Ole Johnson explained to him that he wanted a deed drawn in such a way that his son Victor would acquire the property after his death, but that he (Ole) wanted to retain some control over it at the same time. On the basis of this understanding of what Ole Johnson wanted, Mr. Adams recommended the execution of a joint tenancy deed with right of survivorship.

Both Ole Johnson and Mr. Adams were hard of hearing at the time the deed was drawn. However, Mr. Adams explains that he had no particular trouble ascertaining what Mr. Johnson wanted. It is true that he did not remember where he got the description for the deed. Victor, however, states that he went to the courthouse and got it. The entire transaction took from 15 minutes to a half hour. The deed, after it was executed, was immediately taken to the courthouse and recorded September 6, 1951.

Mr. Adams testified that he was positive that the conversation between them was carried on entirely by Ole Johnson. He was asked:

"He (Ole) appeared to exercise his own judgment in regard to the drawing of this deed? A. So far as I can tell. * * *

"Q. Did he appear to understand what he was doing when he executed the deed and what the results would be? A. So far as I could tell."

 From this testimony it is apparent that as far as Mr. Adams was concerned it appeared to him that Ole Johnson was exercising his own judgment and that he understood the situation. Adams did not detect that Ole Johnson had any mental impairment or weakness. If he had it is quite certain that Mr. Adams would not have allowed him to execute the deed. If this testimony is to be believed, and it was, by the trial court, it is apparent that Mr. Adams was more than just a mere scrivener. He advised Mr. Johnson as to the nature of the deed that he should execute in order to accomplish the results that he had in mind. Ole Johnson had successfully communicated his intent to Mr. Adams. If this comprehension of the situation was that of Ole Johnson and was not the result of any inducement, coercion, fraud, or attempt at overpersuasion, then it is clear that Ole Johnson was competent to execute the deed at the time he did so. While it is readily admitted that Ole Johnson was of advanced age and had been seriously ill in 1949, and was in somewhat impaired health; that for some time prior to the execution of the deed had not actively engaged in business affairs, these things are not conclusive as to his incompetency at the time of the execution of the deed. That is to be determined as of that time. Lee v. Lee, 70 N.D. 79, 292 N.W. 124; Meyer v. Russell, 55 N.D. 546, 214 N.W. 857.

 In the case of Lee v. Lee, supra, 70 N.D. at page 84, 292 N.W. at page 126, this court said:

"The test of capacity is laid down by this court several times. In Nelson v. Thompson, 16 N.D. 295, 301, 112 N.W. 1058, 1060, this early rule, deduced from Jackson [ex dem. Cadwell] v. King, 4 Cow., N.Y., 207, 15 Am.Dec. 354, 355, was adopted: Upon the question of incapacity to render a deed invalid, the court must be satisfied that the grantor was not in a situation to transact that particular business rationally * * * not, on the one hand, that he should be capable of doing all kinds of business with judgment and discretion, nor, on the other hand that he should be wholly deprived of reason, so as to be incapable of doing the most familiar and trifling work. That, if the mind and memory were in such a situation at the time of executing the deed as to render him wholly incompetent to judge of his rights and interests in relation to that transaction, the deed would be void.

"In Meyer v. Russell, 55 N.D. 546, 214 N.W. 857, we say: 'Impairment of faculties by disease or old age will not invalidate a deed, provided, the grantor fully comprehended its meaning and effect, and was able to exercise his will in executing it.'

"Again: 'Before the court will set aside a conveyance on the ground of mental incompetency of the grantor it is necessary to show that the grantor, at the time of the execution of the instrument, was so weak mentally as not to be able to comprehend and understand the nature and effect of the transaction involved.' Nordby v. Sagen, 64 N.D. 376, 252 N.W. 383.

"Old age alone does not affect competence, even though the mind may be weak and impaired compared with what it has been, and even though the capacity to transact general business may be lacking. This is the rule set forth in 16 Am.Juris. 486 [Deeds, Section 85], and it is supported by the citation given therein—Delaplain v. Grubb, 44 W.Va. 612, 30 S.E. 201, 67 Am.St.Rep. 788. On this point see Doyle v. Doyle, 52 N.D. 380, 389, 202 N.W. 860, 863."

It is urged that Ole Johnson did not know the amount of land that he owned. There is

no evidence to sustain that contention. The evidence shows that he wanted to leave all his land to Victor if he survived him.

Several of the children of Ole Johnson, deceased, except Delia Mortenson, gave testimony as plaintiffs, the cumulative effect of which was to attempt to show that Ole Johnson, their father, was incompetent to transact any business at the time he executed the deed on September 4, 1951. Their testimony is more or less general and along the same lines. Its general trend is that Ole Johnson was getting progressively harder of hearing beginning sometime in 1945; that particularly after the 1949 stroke there was a great change in him; that he was tired, slept a good deal of the time, took little if any interest in current affairs, although in the days of his vigor he had been interested in political, religious and all kinds of civic matters; that he was very forgetful; that at times he did not recognize them; that he had trouble remembering their names and would sometimes refer to them by the name of some other son or daughter; that generally there was a great decline in his mentality. They testified that in their opinion he was not capable of transacting any business or competent to do so.

Sigurd Larson, Justin Evenson and John Waddle, neighbors of Ole Johnson, testified for the plaintiffs. Their testimony generally goes to show the difference in the attitude and behavior of Ole Johnson prior to and after the 1949 stroke. Their testimony shows that generally he was alert, vigorous, aggressive and vitally interested in township affairs until his last term, and particularly the last couple of years he served. They indicated that he was, during that time, rather disinterested, would fall asleep at the meetings, was generally satisfied with anything that the other members of the township board would do, and participated only slightly in the decisions that were to be made. In this connection it is well to remember that he was getting harder of hearing, which of necessity would handicap his participation. None of these witnesses, however, would express a definite conclusion that Ole Johnson was wholly incompetent, except one, who was willing to express such opinion.

Sigurd Larson, however, did testify to an incident that indicates that despite Ole's years and hearing difficulties, he retained his power of comprehension. Larson was unable to specify the time more closely than 1951 or 1952. He was soliciting funds for the Salvation Army drive and stopped at Ole Johnson's farm. It was almost impossible for Larson to carry on a conversation with Ole, but he had a list with him. He showed the list to Ole Johnson, and Ole knew what he wanted. He knew that he wanted money.

■ From a careful consideration of the entire record as to the mental competency of Ole Johnson, it appears that while it may be conceded that he was not capable of doing all kinds of business due to his declining years, lack of physical vigor, and his hearing difficulties, we are satisfied that he was of such a mind and memory at the time of the execution of the deed, that he understood and comprehended the meaning and effect thereof, and was able to, and did exercise his will in executing the deed.

There remains for us to review the evidence to ascertain whether the joint tenancy deed was executed by Ole Johnson because of undue influence exerted upon him by his son Victor.

There is no direct evidence in the record to indicate that Victor Johnson exerted undue influence on his father resulting in the execution of the deed dated September 4, 1951. There are only circumstances in the evidence from which inferences might be drawn which would tend to show that perhaps Ole Johnson was under the influence of his son Victor. But these circumstances which are said to warrant such inferences are also susceptible of other inferences pointing in the opposite direction.

■ In the early case of Fjone v. Fjone, 16 N.D. 100, 103, 112 N.W. 70, 71,

our court quoted with approval the following:

" 'Not every pleading, urging, or cajoling will amount to undue influence. The act is so nearly akin to duress that it differs only in the quality of the force. The importunity must amount to coercion, destroying the freedom of mind, so that the act is performed rather from motive of fear or helplessness. To avoid a will or deed it must be shown that the free agency of the party executing the instrument was destroyed. Mere appeals to the affections, or the impulse of gratitude, however importunate, are not sufficient.' "

 Undue influence takes many forms. The term has not been, nor perhaps will it ever be, clearly defined by the courts. Its determination depends upon the circumstances of the particular case. It is in the nature of a species of constructive fraud. Generally, it may be said that in order to render a deed voidable on the ground of undue influence and thus subject to cancellation by a court of equity, it must appear that some improper influence was exercised over the grantor in the deed in such a way and to such an extent as to destroy his free agency or his voluntary action by substituting for his will the will of another. In other words, undue. influence which will void a deed is such influence as is obtained by excessive importunity, superiority of will or mind, or by other means constraining the grantor to do what he would want to do but is unable to refuse. 16 Am.Jur., Section 38, Undue Influence, page 460.

 The essential elements of undue influence required to be shown to authorize the cancellation of the deed are that the victim is rendered incapable of acting on his own motives, which implies a weak mentality. Parris v. Benedict, 28 Wash.2d 817, 184 P.2d 63, 67. Undue influence to justify setting aside a deed is such overpersuasion, coercion, force or deception as

breaks the grantor's will power, not merely influence of natural affection. Manahan v. Manahan, Mo., 52 S.W.2d 825, 827.

 It has been held that whatever may be the particular form of undue influence asserted in all cases, three factors are involved:

1. A person who can be influenced.

2. The fact of improper influence exerted.

3. Submission to the overmastering effect of such unlawful conduct. 43 C.J.S., Influence, p. 380.

These elements of undue influence must all be present.

We will now examine the evidence with these necessary elements of undue influence in mind.

Franklin Johnson, one of the sons of Ole Johnson, stayed on the farm until the year 1935. He worked there off and on until the year 1953. In 1940 or 1941, Ole Johnson, his father, deeded a section of land to him and his brother, Victor Johnson. This section was known as the "Finstad Place". The land was operated by Franklin, Victor and Ole as a part of the home farm. Franklin testified that while it seemed that Ole Johnson was the boss, sometimes he did not appear to be that way. Then he states that his father told him to go ahead and build a barn on the Finstad Place. A couple of days after that he came back and told him not to build it because Victor said "Nothing doing." That was in the year 1946. Victor denied this and says he never heard about it. At any rate there is a direct conflict in the evidence as to whether this incident occurred.

 There is no indication in the evidence that in 1946 Ole Johnson's condition was impaired either physically or mentally; that he was not capable of directing the farming operations. Nor does the evidence show, even assuming that this incident took place, that Victor exerted any

undue influence upon Ole Johnson to cause his change of mind. Normal people change their mind and from all we know of this incident, if it took place, it may have been the result of normal reasoning operating upon Ole Johnson's mind. Victor was a co-owner of the Finstad Place. He had a perfect right to object to the building of a barn thereon. That the father respected his objection does not indicate that he was subject to his influence. It indicates rather that the father had both the intelligence and fairness to appreciate the rights and desires of a co-owner of the farm on which the barn was to be built. Just exactly what took place with reference to this we do not know. But it is familiar law that modest persuasion or arguments addressed to the understanding or the appeal of affection cannot be deemed undue influence in a legal sense. Calveard v. Reynolds, 281 Ky. 518, 136 S.W.2d 795, 799. If we can properly judge the character and general behavior of Ole Johnson as gathered from the evidence, he was a man of positive ideas and disposition. In 1946 he was not a man who was likely to be the subject of undue influence. This incident, if it took place, occurred 8 years before Ole's death. It is so remote as to time and so indirect as evidence of undue influence that it cannot be said that it is evidence of undue influence in procurement of the deed on September 4, 1951.

In 1947 Victor bought an airplane. His father furnished the funds. The evidence indicates that Ole Johnson was apprehensive about the use of airplanes. He was scared of them himself. Mrs. Delia Mortenson talked to her father about this matter. He wanted her views upon it. She told him that as far as she was concerned an airplane would not be any worse than a car. Then Ole Johnson told Victor to go ahead and buy an airplane "if he wanted to". Then Mrs. Mortenson testified that he said with reference to this matter, "What was his is mine, what is mine was his." This testimony relates back to 1947. Ole Johnson at that time was a man about 83 years of age. There is no indication in the evidence anywhere that at that time of his life, although he was getting harder of hearing, that he did not possess considerable mental and physical vigor for a man of his age, or that he was not possessed of his mental faculties. He had at that time not been weakened by any serious sickness. He suffered the two strokes after that, one in 1948 and the other in 1949. The evidence with reference to Victor's purchase of an airplane is not necessarily, as we view it, indicative of undue influence exerted by Victor upon his father. It is evidence that Ole Johnson considered that what he owned also belonged to Victor. What was his was Victor's. It corroborates Victor's statement that for years he had been telling him that he was going to leave him the property, if he stayed at home. This incident tends to establish the fact that Ole Johnson had long ago made up his mind that Victor's services to him, his presence on the farm at all times, and the many dutiful things that he had done for the father, may have been the basis for his attitude.

An incident is related by Melvin Johnson, another son of Ole's, with reference to the Culber Place. This also took place in 1946. The evidence is somewhat meager and sketchy as to what actually took place. Melvin Johnson had lived with Victor and Ole Johnson on the farm until 1946. He testifies that some difficulty arose between him, his father and Victor over some matters. He said that he had been promised the Culber Place. At that time he was 46 years of age. He said:

"* * * kind of liked to know myself if I had anything or didn't, so one morning I asked dad and Victor, was sitting there when eating breakfast and Mr. Brother got mad, going to throw me out, you don't need to throw me out, still can walk out, that's why I wasn't there for four years."

He further testified that his father did not say anything at the time. There is no fur-

ther testimony on this matter. Whatever may have been the cause of the altercation between Melvin and Victor, there is no clear indication that this argument between the brothers resulted from undue influence exerted by Victor upon his father. In the first place the father did not take part in the conversation. He apparently sat silent, if he heard the conversation. It is also to be remembered that this incident took place in 1946, while Ole Johnson was still apparently in possession of his faculties and physical vigor. Melvin left home for 4 years, but came back in 1950 in spite of this difficulty and stayed on the farm until sometime in 1953. While Melvin Johnson stayed on the farm during that time, he was farming his own land which he had acquired sometime before. The matter was never mentioned again. The incident is too remote, vague and indefinite to constitute satisfactory evidence of undue influence.

Ole Johnson, apparently on his own accord, either in 1947 or 1948, quit driving his car to town. The testimony indicates that he drove it around the farm until 1950, when he quit driving it altogether. Roy Johnson, one of the sons, testified that during one of his visits while talking in the kitchen to his father, he was attempting to cheer his father up and urging him to take care of himself and forget about all of his business; that in time he would be driving his V-8 again. Then he relates that Victor turned around and said, "Don't give him a bright idea." This is urged as evidence of Victor's dominance over his father. The testimony does not show the exact time of this conversation, but it must have been sometime in 1949, after the second stroke. Victor would naturally be concerned about his father's driving a car after a siege of severe illness. At any rate Ole was at an age when even a healthy person should perhaps not drive a car. Victor's concern was that his brother, Roy Johnson, not give his father any ideas of driving again, and is in harmony with the thought that he did not want his father to endanger himself by the use of his car. It indicates a natural solicitude for his father's safety.

We have diligently searched the record and find no direct evidence of undue influence. Such inferences as may be drawn from the incidents heretofore set forth and the implications of the testimony of the sons and daughters of Ole Johnson creating an impression that he was so weak mentally as to be amenable to any suggestion, particularly from Victor, are also subject to interpretations that indicate that Ole Johnson was exercising his own will and judgment. The evidence wholly fails to show any suggestions from Victor that the land be deeded to him. If the evidence of Victor, Mr. Adams, and Delia Mortenson, is worthy of credit, it appears that not only did Ole Johnson know what he was doing when he executed the deed which is the subject of this action, but he was carrying out an intent that had been formed many years prior to that time. There is evidence in the record that he had made casual remarks to some other of his children indicating that they would get something. These remarks are indefinite as to time and content. There is property in the estate valued at $29,083.50.

There is no evidence showing that Ole Johnson, after the 1949 stroke, talked foolishly or talked nonsense or that his behavior was irrational except when he was seriously ill.

The inferences of undue influence that are said to exist are contradicted by evidence in the record. It is to be noted that Ole Johnson, according to the testimony of Mr. Adams, imparted to Adams his desires indicating that he wanted to deed the property to his son Victor and still at the same time have control over it. With that information Adams advised a joint tenancy deed. The execution of the joint tenancy deed did not constitute an outright or absolute gift of the property to Victor. A joint tenancy deed with right of

survivorship during the lifetime of both tenants, places the ownership of the real property in each to a one-half interest in the land. In re Kaspari's Estate, N.D., 71 N.W.2d 558.

It is here contended that the deed is the fruit of undue influence exerted by a son upon his father. The relationship between Ole Johnson and his son Victor had no doubt been close, continuous and confidential. It had existed from Victor's early youth to the time of his father's death. Victor had for some reason stayed with his father. He was the only one of the children who stayed with him at all times until his death. He helped to manage the farm. In fact, he took over the management thereof completely when his father became old, infirm and unable to look after the many details involved in the management and operation of a large farm such as Ole Johnson owned. It was stipulated that approximately 1784 acres were involved. The evidence shows the absolute confidence of the father in his son Victor. Conceding for the moment that the relationship was close, continuous and confidential, and when taken in connection with the facts claimed to exist, may raise an inference or presumption of undue influence, yet was it such as will void a deed, or so unlawful or fraudulent influence as to control the will of the grantor? We do not believe so, unless mere opportunity, and susceptibility to undue influence are sufficient. The cases indicate that mere opportunity to exert undue influence and the susceptibility of a party to influence are insufficient. There must exist facts which show submission to the overmastering effect of unlawful conduct. Such facts do not appear in the evidence before us.

■ Affection, confidence and gratitude of a parent to a child, which inspires a gift is a natural and lawful influence and will not render it voidable unless this influence has been so used as to confuse the judgment and control the will of the donor. Blochowitz v. Blochowitz, 122 Neb. 385, 394, 240

N.W. 586, 82 A.L.R. 949. See also Fjone v. Fjone, 16 N.D. 100, 103, 112 N.W. 70; Lastofka v. Lastofka, 339 Mo. 770, 99 S.W. 2d 46, 57. In the last cited case the court said:

"A voluntary act influenced by the love, affection, and gratitude of a mother for a dutiful son cannot be said to be the result of an undue influence. Undue influence cannot be made out by mere suspicion or the mere showing of an opportunity to influence. 'There must be somewhere proof of an undue influence itself. * * * To be effective, it ought to be sufficient to destroy the free agency of the deceased at the time of making the' deed. 'It must not be merely the influence of natural affection; for affection is a stream that presumably flows at all times and its waters are under no ban known to the law. There must be present and in active exercise overpersuasion, coercion or force, fraud or deception breaking the will power of the' grantor. Teckenbrock v. McLaughlin, 209 Mo. 533, 108 S.W. 46."

■ The evidence in the case at bar is such that the execution of the deed by Ole Johnson is as consistent with influence born of love, affection and gratitude towards this son who had stayed with him at all times, as it is with undue influence procured by overpowering the will of Ole Johnson so that the deed that he executed was the result of Victor's will and not that of his own.

■ It must be remembered that the ownership of property is absolute. When a single person has the absolute dominion over it he may use it or dispose of it according to his pleasure, subject only to general laws. Section 47-0202, NDRC 1943. This absolute ownership implies the right of arbitrary disposition of property of a capable and uninfluenced person. It is a corollary of absolute ownership. It is often true in connection with deeds or wills

that the disposition of property indicates disregard of some, preference for others, partialities and caprice of the party disposing of the property. But if the party owns the property and has the mental capacity to know what he is doing and is uninfluenced the law does not concern itself with these matters.

"The mere fact that a parent deeds property to a child does not of itself raise a presumption of undue influence. McLeod v. McLeod [145 Ala. 269, 40 So. 414, 117 Am.St.Rep. 41] ; Mallow v. Walker, 115 Iowa 238, 88 N.W. 452, 91 Am.St.Rep. 158. * * * There is no presumption of undue influence or fraud arising merely from the fact that some children are favored to the exclusion of others. Burton v. Burton, 82 Vt. 12, 17, 71 A. 812, 814, 17 Ann.Cas. 984. The rule is stated in 16 Am. Juris. 661 [Deeds, Section 393], 'No presumption arises from such relationship (parent and child) although some children are thereby favored to the exclusion of others and although the beneficiary is the adviser of the parent and has the control and management of his affairs. This is true even though the parent is aged or aged and infirm.' " Lee v. Lee, 70 N.D. 79, 87, 88, 292 N.W. 124, 128.

But it is asserted that here a confidential relationship existed between Ole Johnson and his son Victor, and therefore, the burden is cast upon Victor to show that the conveyance was made freely and voluntarily and with full knowledge on the part of the grantor of its character and effect. Doyle v. Doyle, 52 N.D. 380, 202 N. W. 860; Lee v. Lee, supra. Conceding that there was a confidential relationship existing between Ole Johnson, the grantor, and his son Victor, one of the grantees, the evidence indicates that he has carried the necessary burden to show that the deed was freely and voluntarily made; that Ole Johnson knew what he was doing when he executed the deed; and that no such fraud

or undue influence exists to warrant its cancellation. In that connection it must be remembered that this was not an outright gift to Victor Johnson. During the lifetime of his father Victor only held an undivided one-half interest in the property.

The incidents related by the witnesses to show that there was not only an opportunity for the exercise of undue influence upon Ole Johnson, but that Victor did exercise undue influence upon him, relate to matters that arose before Ole's serious illnesses when it appears that he was in good health and vigor for a man his age. The evidence shows that there was no attempt to secrete the deed. It was recorded on the 6th of September 1951. Neither Ole Johnson nor Victor said anything about it, but there does not appear to be any reason for publication of the grant except such as the recording thereof would give. The plaintiffs did not know, or claim they did not know, of its recording, asserting that Victor was secretive about the matter and after the father's death did not want to divulge what disposition had been made of the property. Whatever prompted this reluctance on Victor's part we are not prepared to say that the only inference therefrom is that Victor procured the execution of the deed by undue influence.

We have searched the evidence thoroughly and after giving the trial court's findings the appreciable weight to which they are entitled, we believe that the decision of the trial court must be sustained. Not only did the trial court make specific findings upon the competency of Ole Johnson and upon the issue of undue influence, but he wrote a long analytical memorandum decision in which it clearly appears that the trial court considered carefully the credibility of the witnesses and the weight of their testimony.

Quoting from Wallace v. Harris, 32 Mich. 380, our court said in Fjone v. Fjone, 16 N.D. 100, 103, 104, 112 N.W. 70, 71:

" 'The line between due and undue influence, when drawn, must be with full

recognition of the liberties due every true owner to obey the voice of justice, the dictates of friendship, of gratitude, and of benevolence, as well as the claims of kindred, and, when not hindered by personal incapacity or particular regulations, to dispose of his own property according to his own free choice.' "

When the evidence in the case at bar is tested by the rules we have heretofore set forth, we conclude that it is insufficient to warrant a finding of undue influence practiced upon Ole Johnson by the defendant Victor Johnson to secure the execution and delivery of the deed in question.

The judgment of the trial court is affirmed.

BURKE and MORRIS, JJ., concur.

GRIMSON, Chief Justice (dissenting).

This case involves a deed by which an ailing father, Ole Johnson, on Sept. 4, 1951, transfers all of his real estate by a joint tenancy deed with right of survivorship to his son, Victor, and himself. The plaintiffs claim that Ole Johnson did not have the mental ability to understand the transaction when he signed the deed and that Victor exercised undue influence on him to secure that deed. Ole Johnson, hereinafter referred to as Ole, was the father of twelve children of whom his son, Victor, was the youngest. Victor was 41 years old at the time and single. Ole was 88 years old. Ole and Victor lived together alone for eleven years before the deed was issued. During the latter part of that time Ole was ill, and seriously so the last two or three years. For at least the last two years before the execution of the deed Victor had complete management of Ole's farm, consisting of 1784 acres, and stock and machinery necessary for the operation thereof. It is admitted that there existed complete trust and confidence between the two and that there was ample opportunity for Victor to exercise influence on his father.

In Fjone v. Fjone, 16 N.D. 100, 112 N.W. 70, this court held:

"Courts of equity will carefully scrutinize contracts between persons occupying relations of trust and confidence, and it if appears that a contract was entered into through the exercise of undue influence practiced by one party upon the other, or if it is grossly unfair or inequitable, the courts will not hesitate to cancel the same." See also 24 Am.Jur., Sec. 47, p. 756.

It is therefore necessary to consider carefully all of the evidence in the case. The decision will depend upon the conclusions that can be drawn from that evidence. Let us first consider the evidence on mental capacity.

The majority opinion states correctly the facts of Ole's active life before he was struck with illness. He had been a successful farmer and a very active participant in community affairs. His children all helped him and worked on the farm with him, without pay, until they themselves married, and sometimes after their marriages. He was known as the boss of the family. In 1948, six years before his death, he suffered a stroke and another one in 1949. Thereafter he was ill and died in 1954 of arteriosclerosis at the age of 90.

As said in the majority opinion, Dr. Kenneth Melvey, who treated Ole prior to his second stroke, gave his opinion that after his first stroke Ole was adequate mentally except for periods when his blood pressure would rise and he would have serious headaches. His son, Rosgard, however, testified that after he had been in the hospital Ole "used to complain to me that he acquired a trouble with his head and had pains." His son, Roy, who visited him often, quoted his father as saying: "Well I believe half of the time when I was down visiting with him he says I got sort of headache, it is never cleared." That indicates that he suffered continuously from headaches. On cross examination Dr. Melvey

testified that Ole's blood pressure "was at constant high level but there was some variations. So far as hardening of the arteries, that is a progressive thing, * * * arteriosclerosis is hardening of the arteries and as they harden the lumen on the inside gets smaller and necessitates greater pressure on the heart to get blood through so it is a considerable factor in high blood pressure."

"Q. And I assume when the blood pressure reached this state where you say he got headaches that would indicate some effect on the brain? A. Yes.

\* \* \* \* \* \*

"Q. Is it very common, Doctor, that a stroke renders a party mentally incompetent? A. Yes."

Dr. Robert Johnson (no relative) was called as an expert witness for the plaintiffs. He had not treated Ole at any time. The history of Ole's illness was stated to Dr. Johnson in a hypothetical question. In his answer Dr. Johnson states: "Once a person has a stroke a certain amount of brain tissue is damaged. Brain tissue does not regenerate. It is a characteristic of brain cells that once destroyed, never grow new brain cells; therefore, when he had a portion of brain tissue destroyed that would never return.

"Q. Would that condition affect a man's business capacity, his capacity to look after his business affairs? A. Yes, it could very much.

"Q. And I take it it would not improve his capacity? A. It would never improve his capacity.

"Q. It would have the other effect? A. That's right."

According to the testimony of the doctors, arteriosclerosis and hardening of the arteries from which Ole suffered and which led to his death are progressive diseases. The evidence shows that Ole was ill from those diseases until his death.

The medical testimony alone is not conclusive. Those doctors did not treat him at the time of his second stroke or after that time. However, it is a basis for lay testimony of his future mental health.

It has been generally held that lay witnesses are competent to give an opinion as to a person's mental capacity when they, from daily intercourse with or observation of him, can make an intelligent comparison of his mental manifestations with his prior conduct at a time when it is admitted he enjoyed the full use of his natural faculties. Nelson v. Thompson, 16 N.D. 295, 301, 112 N.W. 1058; Beller v. Jones, 22 Ark. 92; Dominick v. Randolph, 124 Ala. 557, 27 So. 481; People v. Sanford, 43 Cal. 29, 33; Halde v. Schultz, 17 S.D. 465, 97 N.W. 369; Jones on Evidence, 3rd. Ed., Sec. 364, p. 550, and cases cited. In Eggert v. Schroeder, 158 Neb. 65, 62 N.W.2d 266, 271, it is held:

"That a grantor did not understand and comprehend the purport and effect of what he did when he executed the deed may be established by the opinion of nonexpert witnesses if proper and sufficient foundation therefor has been laid. See, In re Estate of Wahl, 151 Neb. 812, 39 N.W.2d 783; In re Estate of Witte, 145 Neb. 295, 16 N.W.2d 203, 17 N.W.2d 477."

Seven of the brothers and one sister testified for the plaintiffs. All agreed that there was a great mental deterioration in Ole after the 1949 stroke. Clifford Johnson said his father didn't recognize him at times and that it was hard to make him understand; that most of the time at home he would be lying on the duofold or sitting in a rocker about half asleep. Rosgard Johnson testified to the same effect. Roy Johnson told of the difficulty in talking with his father and his forgetfulness. All of them had visited their father very often and they said that in their opinion he was incapable of doing any business after the 1949 stroke. The testimony of Franklin Johnson, next youngest to Victor, and the

one who worked with Victor and his father the longest testified as follows:

"Q. Well now you say you noticed a change in him after he was in the hospital in '49, tell us what changes you noticed in him? A. Oh, after that time lots of times when come down there, go over every day, come there in morning he would not remember my name, sometimes called me Cliff, sometimes called me Leo or any of the other boys, would not even know my name.

"Q. Was he active in running the farm after that? A. No, he wasn't.

"Q. Did he have any difficulty in carrying on conversations with you or with others that might visit there? A. Yes, he would have.

"Q. Tell us about that? A. Lots of times he would start to tell something just get out word or two and forget what it was and would quit right there.

"Q. And did you ever notice him asking the same question over repeatedly? A. Yes, I did.

"Q. In other words he would ask something and you would tell him and pretty soon he would ask the same thing again? A. He would do that different times.

"Q. Did you notice any difference in his knowledge of what was going on, what he read in papers and things like that after 1949? A. I don't think so.

"Q. What I mean—what I am getting at—did he take the same interest in politics and world affairs and things like that? A. No, he didn't.

"Q. Did he talk over with you the things that he read in the newspapers or heard over the radio? A. No, he didn't.

"Q. From your observation, and as I understood you to say, you saw him every day, would you say that there was a definite change in his mental condition after 1949? A. I believe there was.

"Q. And was that going down hill? A. Seemed to be going down.

"Q. From your observation of him and your contact with him over these years, is it your opinion that he was able to look after his business affairs after 1950? A. I don't think so.

"Q. You think that his mind had failed so much that he did not remember things and wasn't able to judge what was good for his business affairs after that so as to be able to run things —that what you mean? A. Yes."

Four of Ole Johnson's neighbors who had known and worked with him testified to the effect that in their opinion Ole was not able to manage his own affairs. Sigurd Larson, who served with him on the township board until 1950, testified:

"Q. Mr. Larson, from your association with Ole Johnson during his last term on the town board as compared to his actions during preceding terms, would you have an opinion as to whether there was any deterioration, falling-off of his mental capacity in the last— during his last term? A. As far as being qualified to decide his personal mental capacity I am not qualified to do that but as I have known Ole Johnson, it is my personal opinion I would say there wasn't much left of Ole Johnson's mental capacity at these meetings, did not take any interest in it, slept most of the time. Years back when Ole Johnson was himself he did not use to sleep on the job, was very active, energetic man, wanting things to move along, wanted things done and at the last township meetings why he just come, picked best chair for him, sat down, went to sleep, woke him up once in awhile asking him opinion—it is all up to you fellows—and dozed off again. That's my opinion, I am not qualified

to say personally how a person is mentally.

"Q. Now we understand, Mr. Larson—? A. But as a fellow that worked with him that's my honest opinion."

Justin Evanson, another member of the Board, corroborated Sigurd Larson.

On behalf of the defendant Victor himself testified, as did his sister, Delia Mortenson, his nephew, Howard Johnson, who was working for him, and one Ervin Hegge. To all of them there does not seem to have been much difference in Ole after the 1949 stroke except that his hearing kept getting worse. Victor said he "did not give up, did not see much difference." He admits the neighbors had had trouble visiting with Ole the last year or so on account of his hearing. All those witnesses admit that Ole did not at times after the 1949 stroke recognize his children. They further state that they never heard nor inquired what Ole's trouble was.

Victor admits that Ole took no part in the conduct of the farming enterprise after the 1949 stroke; that Ole entrusted that matter entirely to Victor.

Howard Johnson, a son of Melvin, one of the plaintiffs and grandson of Ole, testified that he could see no difference in Ole in the year 1951 from prior times. He admits that Ole never discussed business; that Victor was the boss on the farm. He claimed that Ole had a mind of his own and was able to exercise it. He did not, however, point out any instance when Ole had exercised a mind of his own. He testified that Ole's memory was all right and that he never noticed Victor dominating him.

Delia Mortenson, a daughter of Ole, and an unwilling plaintiff, testified that she visited her father at the hospital and at his home; that she helped with the cooking in 1950; that she never knew he had had a stroke; that she thought he was capable of exercising his own judgment. She testified, however, that she did not see her father carry on any business in 1950 or 1951; that she never talked business with him.

Final witness for the defendant was Ervin Hegge, a 30 year old farmer living 4½ miles away from the Johnson farm. He said he had seen Ole three or four times a summer since 1949 when he was visiting Victor. Ervin said that he did not know anything was wrong with Ole's mentality but that "after he got sick that time you know that kind of changed him."

As to Ole's mental ability the testimony of Sigurd Larson is cited. He said that in 1951 or 1952 he was soliciting funds for the Salvation Army. He could not make Ole understand so he showed him a contribution list. Then Ole understood he wanted money. This, it is claimed, showed that Ole retained his power of comprehension. It does not take much mental capacity to understand a contribution list.

The preponderance of the evidence is to the effect that Ole never recovered his mental ability after the 1949 stroke to the extent that he could participate in any business or in his usual community activities. When that is compared with his active and capable participation in all these and community affairs prior to the 1949 stroke, it shows that Ole's mental capacity was affected. That, as the doctors indicated, would be the effect of a bad stroke. We need not, however, determine whether he was totally incompetent as the plaintiffs claim, if while Ole was in such admitted weakened mental condition Victor used undue influence over Ole in order to secure the deed in question, that would vitiate the deed.

The recognized elements necessary to show undue influence are, first, a person that is subject to influence, second, an opportunity to exert undue influence, third, a disposition to exert undue influence, fourth, the result indicating undue influence. In re Burris' Estate, N.D., 72 N.W.2d 884; Davies v. Toms, 75 S.D. 273, 63 N.W.2d

406; Gidley v. Gidley, 130 Neb. 419, 265 N.W. 245; Eggert v. Schroeder, 158 Neb. 65, 62 N.W.2d 266. In this case the fourth element is very important and should not be overlooked.

In the case at bar the evidence clearly shows that Ole Johnson was in a weakened, mental condition at the time of the signing of the deed and would, therefore, be more susceptible to undue influence.

"Conduct which might be insufficient to influence unduly a person of normal mental strength might be sufficient to operate upon a failing mind. One who is infirm and mentally weak is more susceptible to influence than one who is not. In re Estate of Ensminger, 230 Iowa 80, 82, 296 N.W. 814, 815, and cases cited; 68 C.J. 767, § 458." In re Telsrow's Estate, 237 Iowa 672, 22 N.W.2d 792, 796.

Victor had opportunity to exert influence. Since the mother died in 1941 Ole Johnson was pretty much in the care and control of his son Victor. They lived together alone except for such times as they had hired help upon the farm and when Franklin, Melvin, Howard and the daughters helped them. During that time Victor had complete charge of the farming enterprise and was in control of everything. There is some showing that Victor had a disposition to exert undue influence on his father even before the strokes.

In 1942 Cecelia Opdahl, Ole's daughter, helped Ole and Victor with the housework. Ole took her to her home in the evenings. When he left her each night he would thank her and tell her she "would be paid some day." That was only a year after Ole and Victor started living together. At that time Ole apparently intended to help the other children who had worked for him.

In 1946, four years later, Victor's influence is shown in connection with the building of a barn on the Finstad place which Ole had bought in 1940 and placed in Franklin's and Victor's names. It was, however, farmed in connection with the whole Johnson farm so that the proceeds of the crop were in Ole's name. Franklin testified that one day Ole promised him that he could build a barn on that place. A couple of days later Ole came back and said that Victor had said, "Nothing doing." So Ole's mind changed and he did not let Franklin build the barn. It is argued that this change may have been made by ordinary reasoning but even so it was because of the influence of Victor that the barn was not built. Victor first admits he remembered that talk. Then he shrugs off this episode by a reference to building on the home place and says he never heard that Franklin asked his father if he could build on the Finstad place.

The testimony of Delia Mortenson, a daughter of Ole, is cited as showing that Ole had intended for a long time to leave everything to Victor. She claims that in talking to her father after Victor bought an airplane in 1947, her father indicated he had been afraid of an airplane but said he had told Victor to go ahead and buy it if he wanted to, because, "What is his is mine and what is mine is his." That happened six years after Ole had been subject to Victor's influence. If it means, as the plaintiffs claim that Ole's mind was then made up to turn over his property to Victor his mind had been changed since he told Cecelia that she would be paid later. By that time, however, the grain and personal property was apparently being held in joint ownership. The airplane was paid for out of the grain so raised. There is no certainty here that Ole meant that to apply to the real property. It is more likely to have applied to the personal property which was the only property affected by the purchase of the airplane. That remark cannot be considered as proof of a long time intention by Ole to leave everything to Victor.

Victor's attitude is shown when Melvin, while working with Victor in 1946, asked his father about the deed for the land he had been promised. That happened one day while they were eating breakfast. Vic-

tor then got mad and was going to throw Melvin out. Ole said nothing so Melvin walked away. Apparently Victor hadn't wanted his father reminded of those promises and Ole did not have the mental capacity or courage to interfere and answer Melvin's inquiry.

At one time Roy found his father "was not so good" so he tried to cheer him up and said "you will be driving that V8 standing out there." Victor turned around and said, "Don't give him any bright ideas." While this may have been said for the protection of the father it is also a further indication that he did not want his brothers advising his father on any matter.

While these are mere instances they do indicate a disposition on the part of Victor, even before the father had the strokes, to keep the brothers from interfering in his relations with his father. There is at least enough evidence to support the presumption arising from the long and close association of Ole and Victor that such influence existed. After the strokes there is no evidence that Ole had any mind capable of making any decision.

It is admitted that the relation of trust and confidence existed between Ole and Victor. Clearly the evidence shows that during Ole's illness Victor was the strong man and was superior to his father both mentally and physically.

A fiduciary relation exists in every case "in which there is confidence reposed on one side and the resulting superiority and influence on the other. The relation and the duties involved in it need not be legal; it may be moral, social, domestic, or merely personal." Hensan v. Cooksey, 237 Ill. 620, 629, 86 N.E. 1107, 1109; see also Irwin v. Sample, 213 Ill. 160, 72 N.E. 687; Roby v. Colehour, 135 Ill. 300, 25 N.E. 777; Ennis v. Burnham, 159 Mo. 494, 60 S.W. 1103.

In Kirschner v. Kirschner, 113 Mo. 290, 297, 20 S.W. 791, 792 it is said:

"Where one person has acquired over another a position of superior influence or advantage by reason of relationship, trust, or confidence, (whatever its origin,) and business dealings occur between such parties, the court will require proof of the former that the dealings were fair and honest in all respects on his part, under penalty of rescinding such dealings entirely."

"The existence of the confidential relation creates a presumption of influence which imposes upon the one receiving the benefit the burden of proving an absence of undue influence by showing that the party acted upon competent and independent advice of another, or such facts as will satisfy the court that the dealing was at arm's length, or that the transaction was had in the most perfect good faith on his part and was equitable and just between the parties, or, as some of the authorities say, that it was beneficial to the other party." Hensan v. Cooksey, 237 Ill. 620, 86 N.E. 1107, 1109; Thomas v. Whitney, 186 Ill. 225, 57 N.E. 808.

This court has laid down the rule that if the circumstances are such that the grantor is likely to be subjected to the will of the grantee the burden is upon the grantee to show that the conveyance was made freely and voluntarily and with full knowledge on the part of the grantor of its character and effect. Doyle v. Doyle, 52 N.D. 380, 202 N.W. 860; Fjone v. Fjone, 16 N.D. 100, 112 N.W. 70; Brummond v. Krause, 8 N.D. 573, 80 N.W. 686; Smith v. Smith, 84 Kan. 242, 114 P. 245, 35 L.R.A., N.S., 944; Massey v. Rae, 18 N.D. 409, 121 N.W. 75.

The circumstances in the case at bar show not only the confidential relation between Ole, the grantor, and Victor, the grantee, but that the grantor was likely to be subjected to the will of the grantee. The burden is, therefore, upon Victor to show that no undue influence was used by him

on Ole; that this deed was executed freely and voluntarily and with full knowledge on the part of Ole of its character and effect.

Victor has failed to show that Ole took part in any independent business transactions regarding the farm after the 1949 stroke. Victor admits Ole would ride along when Victor was engaged in business transactions without taking any part in them. Further, Ole's deteriorated mental capacity is pretty well shown by the evidence heretofore reviewed.

Victor claims that his father 20 or 30 years before, had told him that if he stayed and helped on the farm he would have the property. He claims his father had repeated that promise. Ole had made the other sons somewhat similar promises. Victor claims he never asked for a deed. That he had been giving the matter some thought, however, is indicated by his statement later to his brother Winfred, to the effect that in an estate proceeding the only way land could be settled as far as the "estate was land, it would have to be called for bids. Apparently Victor was thinking of what would be the best way for him to have that property handled."

Victor, however, testified that his father brought up the matter as they were going to Bottineau to buy groceries on Sept. 4, 1951. The situation at that time with regard to Ole, as far as the evidence shows, was that he was in such a condition that he had not been able to participate in any farming or business of any kind for at least two years before; that he had not made a business decision of any kind during those two years except to buy a cup of coffee, nor is there any indication that he could do so; that he had failed at times to recognize his children; that he could not take a part in any conversation about current affairs; that he would start a sentence, then stop because he forgot what he was going to say, and that he had shown no activity either physical or mental for at least two years before that time. That old man

is now said to have all at once remembered a promise he had made some twenty years before, forgetting all of his other promises on the same matter, and without consultation or advice from any independent source, he is alleged to have been capable of making an $81,000 land deal, disinheriting his eleven children and leaving his property worth $81,000 to Victor, and that he, without talking it over with anybody, all at once insisted upon doing that.

"The law looks with suspicion upon voluntary transfers of property by persons mentally and physically infirm to those having custody of them." Talbott v. Bedford, 53 S.W. 294, 295, 21 Ky. Law Rep. 897; Harvey v. Sullem, 46 Mo. 147, 2 Am.Rep. 491.

Victor claims that upon the suggestion by his father he took him to Attorney Adams where the deed was executed. To dispel any question of undue influence he could have taken him to his brother, Clifford, who lived in Bottineau, to talk this over but he did not do that.

Let us consider what the evidence shows happened in Mr. Adams' office.

Mr. Adams is an elderly lawyer of undoubted integrity. Victor brought his father, Ole, into his office. He claims that Ole did all the talking. Mr. Adams testified that Ole "wanted the property to go to his son, Victor, but he wanted to retain some control over it at the same time." Mr. Adams said: "So far as I remember he (Victor) had nothing to say." Mr. Adams testified that he "suggested a joint tenancy deed which he had me draw." There was no explanation of such a deed nor was Ole informed of his rights under it. Mr. Adams said he thought Ole had some papers with the description of the land. He did not remember sending Victor out for the description but Victor claims that he went to the county court house and got the description. Mr. Adams prepared the deed and Ole signed it. No witnesses were called. No other conversation between

Adams and Ole or Victor is shown in the testimony. There is no showing that Ole read the deed or that it was read to him.

Mr. Adams said that Ole was exercising his own judgment "as far as he could tell" and that he does not remember that there was "anything particularly wrong with Mr. Johnson at the time." There was, however, no examination by Mr. Adams of Ole to ascertain his condition and understanding of what he was doing. Mr. Adams testified that he had known Ole probably 20, 25 or 30 years, "think I used to campaign down there." He had not done any other business for Ole. He was asked if it was not hard for him to recall years afterward what was said when a father and son would come into his office to have a document drawn up. Mr. Adams answered: "Yes, except that I happened to know that Ole was the king of the tribe and the children did not very often tell him what to do."

"Q. That was very true in the old days, wasn't it? A. Yes, it was.

"Q. Do you know whether that continued to be true after Ole was sick in the hospital in 1949? A. I don't know. So far as I know I don't remember knowing he was sick.

"Q. So that you did not notice a change in Ole from what Ole used to be before he was sick and what Ole was after he was sick? A. While I had not done business with him often said, 'How do you do' to him, acquainted and when met on the street would at least pass the time of day and say, 'Hello.' I saw no difference particularly.

"Q. You don't recall seeing any particular difference in Ole Johnson from what you knew him, ten, fifteen, twenty years ago, and what he was in later years? A. No. I don't.

"Q. And so your recollection of this conversation is largely based on your general knowledge of Ole as being the boss of the family? A. Well, I re-

member enough to know that he is one that told me what he wanted. I tried to accommodate him."

That is all the testimony there is concerning the writing and execution of the deed in the case at bar. Mr. Adams says that the transaction took "possibly 20 minutes to a half hour."

In three North Dakota cases cited in the majority opinion as authority for affirming the deed, the decision was largely based on the testimony of the attorney who drew the deed. That testimony was much stronger as to the competence of the grantor than in the case at bar. In Doyle v. Doyle, 52 N.D. 380, 385, 202 N.W. 860, 861, the testimony shows that the attorney whom the grantee had obtained to make the arrangements with his mother with regard to her land, "talked with her privately regarding the matter to ascertain her wishes, explained to her the difference in effect of making a deed and making a will, and advised her against making a deed. She said, however, that she trusted her son, wanted him to have the land and she wished to make a deed." A neighbor who had known her for many years was then sent for to witness this deed. "The testimony of both [the lawyer and the neighbor] is to the effect that Mrs. Doyle was advised as to the meaning and effect of the deed; that she seemed clear in her mind as to the explanation; that she expressed a desire to deed the land; that she personally delivered the deed to her son, knowing what she was doing and intending what was done." In Meyer v. Russell, 55 N.D. 546, 551, 214 N.W. 857, 859, the attorney "told Mrs. Russell that he had a deed for her to execute. He read the formal parts and when he came to the first description after reading it, Mrs. Russell said, 'That was the Palace,' and when he finished reading each description he asked Mrs. Russell if she understood and knew the property which she was conveying to her husband, and she would reply that she did. * * * After reading the deed, Mr. Wood said to Mrs. Russell, 'You are by this deed conveying the major-

ity of your property to your husband, is that what you want to do?' She said, 'Yes, papa and I have talked it all over, and we have a complete understanding and that is what I want to do.'" In Lee v. Lee, 70 N.D. 79, 85, 292 N.W. 124, 127, the attorney "talked with the grantor, at some length, * * * and before the deeds were executed, he required [the grantees] to leave the office, and then he 'explained the significance of the deeds to Mrs. Lee and asked her if that was her desire and she said that it was.'"

Nothing like that is shown to have been done in the instant case. While those cases laid down good law, that law was not applied to such evidence as we have in the case at bar.

Mr. Adams had known Ole and his activities when both were young and active. Since those days Mr. Adams' acquaintance with Ole was only as he met him on the street. There is no testimony that Ole had changed in appearance. Mr. Adams did not know of the illness and mental change which the testimony showed had occurred in Ole. He had at the most only thirty minutes in which to observe Ole. That did not give Mr. Adams much time or opportunity to determine Ole's competence. There is no question of Mr. Adams' good faith. He was just treating Ole as he was during Mr. Adams' acquaintance with him twenty or thirty years before. Mr. Adams was not asked for any advice. He was only asked to draw an instrument to carry out what appeared a predetermined decision. Mr. Adams simply took Ole's mentality for granted, "Tried to accommodate him," drafted a deed in compliance with Ole's request and inserted therein the description Victor handed him. He was merely the scrivener. Nothing further in regard to whether Ole fully understood the transaction appears. There is no evidence of talk between Adams and Ole during the time Victor claimed he was away obtaining the description of the land. Mr. Adams admits he was then hard of hearing. The testimony shows that Ole was also hard of hearing. Conversation between them was undoubtedly difficult. The testimony of Mr. Adams as to Ole's mental competence cannot be held sufficient to overcome the testimony heretofore quoted from plaintiffs' witnesses who had the opportunity to watch Ole and form their opinion as to his mentality in daily association with him.

The result of the deed further indicates the exercise of undue influence on the vendor. Ole had been a successful farmer and all of his children helped him develop that enterprise as they were growing up and some of them much longer. Rosgard stayed with Ole and helped until he was 29 years old and worked with him in threshing for many years after that. Ole promised him a quarter section of land which he did not get. Then there was Melvin who was prevented by Victor from finding out if he would get the quarter that had been promised to him. To the other children Ole had given some old farm machinery, a cow or two or a little money to help them start and had promised some of them, like Mrs. Opdahl, that they would get something later. To Victor and Franklin, who were with him the longest, he had, ten years before, given a section of land. He showed how he loved all of his children and was interested in helping them and treating them fairly. All of the children kept up family visits, love and respect for their father. None of them tried to interfere in his business. One of them testified that they trusted Victor to handle the farm enterprise for Ole and the family. As long as they thought that they would not even think of the appointment of a guardian. There is fully as much love and affection shown between them and their father as between Victor and the father. Victor, however, said nothing to his brothers and sisters, and gave Ole no opportunity to talk to any of them about the disposition of his property before or after the deed was executed. Victor's treatment of Melvin indicates he did not want them to be reminding his father of the promises made to them. Then he took Ole to Attorney Adams without giving Ole the chance

to consult anyone else. The testimony of Mr. Adams discloses no such independent advice as is necessary to overcome evidence of undue influence. Davies v. Toms, 75 S.D. 273, 63 N.W.2d 406. The deed was executed depriving all of the other children of any interest in their father's real property.

The evidence shows that the real estate involved was estimated to be worth $81,-000. That was all left to Victor by this deed. Victor also claims to own all of the machinery with which the farming was carried on. Ole's other children, therefore, have no assurance of receiving anything of Ole's estate. All of them as well as Victor had helped Ole accumulate all of that property. To some of them Ole had made promises indicating his intent to leave them something out of his property. Ole's disposition of his real estate by means of this deed was inequitable and unfair. That was an unnatural disposition of his property by a father who had shown a great interest in all of his children. The execution of this deed, therefore, is a strong circumstance indicating use of undue influence by Victor on his father.

"Only slight direct evidence of undue influence is necessary where the circumstances surrounding the parties are such as to afford ready opportunity for its exercise, or where there is a gross inadequacy or total want of consideration. So, less evidence will be required where the grantor is physically weak and of such mental condition that control thereof is comparatively easy." 26A C.J.S., Deeds, § 211, p. 111; See also Mann v. Prouty, 37 N.D. 474, 490, 64 N.W. 139; Wilson v. Wilson, 246 Iowa 792, 68 N.W.2d 904; Woodbury v. Woodbury, 141 Mass. 329, 5 N. E. 275, 55 Am.Rep. 479.

That certainly was the situation here.

All that Victor has shown to meet his burden of proof, aside from the visit to Mr. Adams, is his own testimony and that of his sister, Delia Mortenson, his nephew,

Howard Johnson and Ervin Hegge that they could not see much mental deterioration in Ole after the 1949 stroke and that they thought he was still capable of doing business. That testimony is overcome by the testimony of seven of his brothers and one sister, Cecelia Opdahl, and of his neighbors and members of the town board. Granting that all the brothers and sisters are interested parties the testimony of the members of the Township Board and neighbors is without prejudice. Under their testimony Ole's mental condition was such that he was incompetent to do any business after the 1949 stroke.

Victor, however, has made no showing that Ole, at any time, recovered from the mental condition described by the unprejudiced witnesses sufficiently as to be able to understand the transaction involved in the granting of that deed. There is no showing except Mr. Adams testimony that he appeared able to exercise his own judgment in regard to the effect of the deed or that he knew what he was doing when he executed the deed. And Mr. Adams limited that by saying, "So far as I could tell." Before that statement Mr. Adams at the most had only the half hour observation of Ole and the memory of Ole as he existed some thirty years prior thereto. The inference from Mr. Adams' testimony is that the memory weighed more with him than the thirty minute observation. Victor presented no evidence that Ole had any independent advice on the transaction or that Ole understood what he had done. The testimony discloses on the other hand that when Ole was in good health and knew what he was doing he intended to give some of his lands to some of the other sons. While the deed was recorded there is no evidence that the other children knew that. Victor admits that he never told them about it. When Winfred asked if everything was fixed, Victor admitted that it was and said he was figuring on giving each of the heirs $500. That indicates that Victor realized the distribution of the estate was not equitable. Even after Ole's death Vic-

tor tried to keep it a secret. On the day of the funeral Winfred asked Victor if everything was made up. Victor said it was and that he would tell Winfred if he would keep it secret for a few days. Winfred would not promise that. Ole's past promises and actions towards his children indicate that he was going to consider them all in the final disposition of his property. Victor has failed to maintain his burden of showing that Ole acted voluntarily and knew the effect of the deed. He has made no showing that he did not exercise undue influence on Ole. Victor's own actions point the other way.

While in cases of this kind where some equities on each side are involved there may be some injustice done to whichever side is held the loser. The only way to avoid that would be for the parties to settle amongst themselves as a family should.

It seems to me, however, that the greater equity is with the plaintiffs. They all helped to build up this property and will receive very little, if anything out of it, in the event this deed is held good. Victor stayed with his father and worked entirely for him longer than anyone else and at a time when Ole most needed the help. He has, however, received more out of the estate, aside from this deed, than anyone else. He received a section of land in joint ownership with Franklin. Then while Victor was running the farm for his father the proceeds of the farm were put in a joint account. Out of those proceeds much of the machinery now on the farm was bought. Victor is now claiming that machinery which is a large part of the $29,083.50 inventoried as the personal estate of Ole. There was $3,200 in that account when Ole died. Victor's share over the expenses of the farm enterprise could be considered as wages for his services. Out of that he bought not only his airplane but a quarter section of land. That the plaintiffs agreed to his keeping that land is indicated by the fact that when this action was first brought that land was included in the complaint. At the trial, however, that land was withdrawn from the complaint so that no claim was made by the plaintiffs to ownership thereof.

Considering the evidence carefully I have come to the conclusion that Ole's mentality was affected by his illness; that Victor exercised undue influence over him at the time of the execution of the deed. That there is not sufficient showing that the deed was executed by Ole as a free and voluntary act with full knowledge of its nature and effect. My opinion, therefore, is that the deed for which this action was brought is void and should be set aside.

SATHRE, Judge (dissenting).

I concur in the dissent written by Chief Justice GRIMSON.

Ole Johnson, the grantor in question had suffered two strokes, one in January 1948 and one on April 23, 1949. After the second stroke he was hospitalized until May 26, 1949 and in February 1950.

Prior to these strokes Ole Johnson had been a very active and energetic man of strong character and independent judgment. He had conducted his business of farming very successfully and had acquired approximately 1,800 acres of land. He had also been active in public and civic affairs and had been a member of the township board for a number of years,—in fact he was considered "the king pin" in his community. However after suffering the strokes referred to he progressively lost interest in public affairs, and at the township meetings he would fall asleep and leave the work and decisions to the other members of the board.

His wife died in 1941, but he continued to live on his farm together with Victor his youngest son who was unmarried, and they continued to live together until Ole's death. The other children stayed with Ole on the farm until they started out for themselves, and some of them continued to help their father with his farm work without

receiving any wages. The evidence shows that the relationship between Ole Johnson and all his children had at all times been friendly and congenial.

On September 4, 1951, Ole Johnson and his son Victor went to the City of Bottineau where Ole wished to see Mr. Adams, a practicing lawyer in that city. According to the evidence Ole wanted a deed drawn in such a way that his son Victor, upon Ole's death, would become the owner of all his land consisting of nearly 1,800 acres of the value of $81,000. However, Ole wished to have some control over it. Mr. Adams recommended a joint tenancy deed with the right of survivorship, and such a deed was drawn by Mr. Adams running to Ole and Victor as joint tenants with right of survivorship, which deed was accordingly executed by Ole and delivered to Victor. Ole did not remember the description of the land, and while he waited in Mr. Adams' office Victor went to the court house and procured the description of the land. Victor filed the deed for record on September 6, 1951, but he did not say anything to his brothers and sisters about this transaction.

It is the contention of the plaintiffs, brothers and sisters of Victor, that their father was mentally incompetent when the deed in question was executed; that undue influence had been exerted upon him by Victor. After Ole had the second stroke in 1949, Victor had charge of all the farming operations, sold the grain produced on the farm, paid all the expenses and made all decisions as to what was to be done in and about the farm, his father having given him full control of its management. There was therefore a confidential relationship between Ole and Victor which had developed over a period of some eleven or twelve years when the two lived together on the farm.

The question is therefore whether Victor during his close association with his father had taken advantage of his father's confidence in him and by undue influence obtained the deed to all of his father's land.

The evidence shows that the strokes suffered by Ole Johnson left him in a weakened physical and mental condition. The medical testimony in the record shows that the strokes suffered by Ole Johnson in 1948 and 1949 were caused by arteriosclerosis, that is hardening of the arteries resulting in hypertensity or high blood pressure. Dr. Melvey who was called when Ole had the first stroke testified for the defendant at the trial. He stated that Ole was suffering from hypertension and high blood pressure, had episodes of severe headaches, diplopia, double vision. He stated that he thought that Ole "was adequate mentally except for periods when his blood would rise and he would have very severe headaches." On cross examination Dr. Melvey testified as follows:

"Q. Will you describe what the effect on the brain tissue is from this hardening of the arteries and high blood pressure? A. Yes, when the pressure gets up quite high the *brain gets nourishment but only at a terrific effort on the part of the heart and the vascular system* as a whole. In addition to hardening of the arteries there is a spasm and as a result generally we have headaches of rather severe degree.

"Q. And is there a deterioration of brain tissue? A. Yes, depend on degree of hardening of arteries, there is gradual shutting off of blood supply to various parts of the brain, perhaps two or three millimeter of the brain cortex may be deprived of its food and various mental changes will take place.

"Q. Now will you explain a stroke and its connection with these other conditions that you have identified? A. Stroke is *usually a hemorrhage*— these vessels are brittle and when subjected to high pressure they rupture and depending on the size of the vessel you have a serious or not so serious condition.

"Q. Is this rupture of blood vessel in the brain? A. Yes

"Q. And that rupture resulted in what you call a stroke? A. Yes.

"Q. And I take it the more strokes a person suffers the greater is the destruction of the arteries in the brain? A. Yes.

"Q. And does that have any effect on mental capacity? A. Yes.

"Q. In other words, his mental capacity will deteriorate as strokes recur? A. Yes."

Dr. Robert Johnson, a practicing physician and surgeon at Bottineau, North Dakota was called as a witness by the plaintiffs. He had not treated Ole Johnson. His testimony was given in response to hypothetical questions propounded by plaintiffs' counsel reciting the medical history as testified to by Dr. Melvey. Dr. Johnson discussed the effects of hypertensity, hardening of the arteries, arteriosclerosis, and their effect upon the brain and mental capacity of the patient. He stated that "this man (Ole Johnson who was 87 or 88 years old when he had the first stroke) had an apparently advanced arteriosclerosis which would be characteristic of a man of that age, which condition accelerated or speeded up the process of hardening of arteries and narrows the opening of the arteries so that blood supply to the brain is insufficient—can be speeded up in presence of high blood pressure." He stated further that "once a person has a stroke a certain amount of brain tissue is damaged, brain tissue does not regenerate. It is a characteristic of brain cells, once destroyed never grow new brain cells. Therefore, when he had a portion of brain cells destroyed that would never return." He was then asked: "Would that condition affect a man's business capacity to look after his business affairs? Yes, very much."

It clearly appears from the testimony of the two physicians that Ole Johnson's mental as well as physical condition had deteriorated considerably after he suffered the strokes in 1948 and 1949. All of the farm management was left to his son Victor. There can be no doubt that Victor exerted a great deal of influence over his father and that his father was susceptible to such influences. Victor never consulted with his brothers and sisters with reference to their father's property or business affairs. When the arrangements were made for the transfer to him of all of his father's land he never told them about it, but kept the transaction secret until after his father's funeral, and even then was reluctant to tell them about it. It is clear from the evidence that after Ole Johnson had the two strokes he took no part in operating the farm or in any business connected therewith; everything was left entirely to Victor. In view of Ole's weakened mental condition it was the duty of Victor to act in utmost good faith, not only so far as the interest of his father was concerned but also with reference to the interests of his brothers and sisters. In 26 C.J.S., Deeds, § 62, pp. 768–769 the rule applicable in such cases is thus stated: -

"It is a fundamental rule of law relating to deeds that while age or physical and mental infirmity does not of itself show that the deed of a grantor suffering from such physical and mental infirmity was the product of undue influence, yet when such facts appear the suspicions of equity are aroused, and where found in conjunction with other matters indicating imposition that may show undue influence, transactions under such circumstances will be scrutinized with great care in courts of equity.

"While a deed may be canceled, because procured by undue influence, although executed by a person of sound mind, and raising of the issue of undue influence presupposes sufficient mental capacity to execute a valid deed, the mental power or condition of the grantor is a proper factor for consideration

in determining whether or not his deed was a product of undue influence; and, if there is a reason to believe that influence has been acquired over a person of weak mind, the transaction will be carefully scrutinized in equity. Under the rule that the essence of undue influence is that the victim is rendered incapable of acting on his own motives, as discussed supra subdivision a(1) of this section, it has been held that a weak mentality is implied.

"A deed secured by influence which was undue as applied to a mentally weak grantor will be invalid, as where age and infirmity combine with inequitable circumstances to show undue influence; and, where the maker of a deed is so reduced by mental and physical weakness as to become the mere passive agent of the dominating will of another in executing the instrument, it may be regarded as the product of undue influence."

Likewise in 16 Am.Jur., Deeds, Sec. 40, pages 462, 463, it is stated:

"The existence of a family or a confidential or quasi-confidential relationship between the grantor and the grantee in a deed is an important factor in determining the presence of undue influence in the execution of the deed, especially as it appears that the beneficiary was in honor bound to prefer the interests of the donor to his own. Such relationship exists between the grantor and grantee where the latter is the grantor's spiritual adviser or where he professed to be a spiritualistic medium. It exists also between husband and wife, a woman and her affianced husband, parent and child, or a child and a person in loco parentis, guardian and ward, brother and sister, attorney or other legal adviser and client, physician and patient, banker and customer, and principal and agent.

"It is often said that courts of equity regard conveyance between children and their parents as objects of jealousy or that such conveyance will be watched with a jealous, critical, or searching eye. In other words, the circumstances attending such a transaction will be vigilantly and carefully scrutinized by the court to ascertain whether there has been undue influence in procuring it. But the fact of the relationship does not necessarily prove undue influence. Affection, confidence, and gratitude between a parent and a child which inspire a gift from one to the other will not render the gift voidable, unless some improper influence has been so used as to confuse the judgment and control the will of the donor."

See also Peterson v. Mitchener, 79 Ohio App. 125, 71 N.E.2d 510.

The medical testimony in the record shows Ole Johnson's mental capacity deteriorated progressively after he suffered the two strokes; and because of the nature of the ailment and his advanced age there was no hope of any improvement in his condition. He certainly was not in condition mentally to realize that by the deed in question he transferred all of his land, valued at $81,000 to one of his children to the entire exclusion of all of his other children. It does not appear that he had had opportunity to discuss the matter of this transfer with anyone, except Victor, nor were the other children mentioned when Victor and his father were in the office of Mr. Adams where the deed was drawn, executed, and delivered to Victor. There was at the time a confidential relationship between Victor and his father, and he was in duty bound to exercise the utmost good faith in any transaction which took place between them.

If Victor had acted openly, fairly, and honestly, there would have been no occasion to keep his sisters and brothers in the dark, as to the execution of the deed. But he was interested in a transfer to himself of

land of the value of $81,000 in which, under the laws of succession, they would be entitled to their just share upon their father's death. The legitimate inference from his conduct is that he knew he was taking an undue advantage of them and that he felt the better part of wisdom was to keep them in ignorance of the facts. The procurement by Victor of the deed to all of his father's land, and his effort to conceal the transaction from his sisters and brothers savors strongly of bad faith.

The judgment of the district court should be reversed.

## On Rehearing

A rehearing was granted in this case upon petition of the appellants. The case was completely reargued on the facts and the law. Respondent filed a supplemental brief. The reargument did not present any issues of law or facts which had not been previously considered by this court in arriving at its decision. However, we have again studied the record and all of the briefs. Such study merely confirms our previous conclusions. We adhere to our former opinion.

BURKE and MORRIS, JJ., concur.

SATHRE, Judge.

I adhere to my dissent heretofore written.

After the arguments on the rehearing and a further thorough study of the record I am still convinced that the analysis of the evidence and of the law in my dissenting opinion is correct and that as a court of equity we should have set that deed aside.

GRIMSON, Chief Justice.